Ozie BOWEN, on behalf of himself and all others similarly situated, Plaintiffs-Appellants,

v.

FIRST FAMILY FINANCIAL SERVICES, INC., Defendant-Appellee.

No. 98-6492.

United States Court of Appeals,

Eleventh Circuit.

Nov. 22, 2000.

Appeal from the United States District Court for the Middle District of Alabama.(No. 97-01279-CV-S-N), Charles S. Coody, Magistrate Judge.

Before EDMONDSON, CARNES and WATSON[*], Circuit Judges.

CARNES, Circuit Judge:

The plaintiffs, Ozie Bowen and Ethel Ford, filed a putative class action lawsuit against First Family Financial Services, Inc. ("First Family"), claiming that the lender's practice of requiring customers to sign arbitration agreements before obtaining a consumer loan violates the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.* According to the plaintiffs, that statute prohibits a creditor from conditioning the extension of credit on a customer's agreement to forego his right to judicial remedies under the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.,* and an arbitration clause contravenes that prohibition. The magistrate judge, acting by consent as the district court,[1] concluded that the plaintiffs had not alleged a violation of the ECOA, and that the arbitration agreement signed by plaintiffs was fully enforceable pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.* The plaintiffs appealed.

The plaintiffs have standing to challenge the legality of First Family's requirement that customers sign arbitration agreements as a condition of credit, because they were required to and did sign such an agreement in order to obtain credit from First Family. On the merits of that issue we agree with the district court that such a requirement does not violate the ECOA. As to the separate questions of whether arbitration agreements are generally unenforceable under the TILA, and whether this one is unenforceable for some other reason, we conclude that the plaintiffs lack standing to raise those issues, because there has been no attempt to

[*]Honorable James L. Watson, Judge, U.S. Court of International Trade, sitting by designation.

[1]The parties consented to have the magistrate judge exercise the authority of the district court pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ P. 73. All of our references to the district court in this case are to the magistrate judge acting as the district court.

enforce the agreement against them, and they have not established that there is a substantial likelihood that it will be enforced against them in the future.

## I. BACKGROUND

In 1996, Bowen and Ford, the plaintiffs, separately obtained small loans from First Family, and as part of their transactions, each of them was required to sign a two-page document entitled in bold lettering: "ARBITRATION AGREEMENT." The agreement provides that First Family and the consumer "agree to arbitrate, under the following terms, all claims and disputes between you and us, except as provided otherwise in this agreement." In a more specific provision, the agreement states that it applies to "all claims and disputes arising out of, in connection with, or relating to: ... any claim or dispute based on a federal or state statute."

In August of 1997, Bowen and Ford filed this putative class action. They contend that the TILA grants consumers a non-waivable right to obtain judicial, as distinguished from arbitral, redress of statutory violations, including the right to do so through a class action. That is the basis of their claim that First Family's requirement that they sign the arbitration agreement violated the ECOA, specifically 15 U.S.C. § 1691(a)(3), because it forced them to waive their right to litigate TILA claims in order to obtain credit. The complaint sought actual and statutory damages as well as declaratory and injunctive relief. Notably, other than their challenge to the arbitration agreement requirement, the plaintiffs did not claim that First Family had violated a substantive provision of the ECOA, the TILA, or any other provision of the Consumer Credit Protection Act, 15 U.S.C. §§ 1601-1693r.

The district court granted First Family's motion for judgment on the pleadings. In its order, the court first concluded that the plaintiffs had failed to plead how they exercised a right under the Consumer Credit Protection Act or how First Family had discriminated against them in response to their exercising such a right. Also, the district court was "not persuaded" that the "right" on which the plaintiffs based their ECOA claim—the right to judicial redress, and particularly, the right to pursue a class action for violations of the TILA—was a "right" under the Consumer Credit Protection Act within the meaning of § 1691(a)(3). The court then concluded there was no conflict between the TILA and the FAA that would render the arbitration agreement unenforceable. Consequently, the court granted First Family's motion for judgment on the pleadings and dismissed the case with prejudice.

## II. DISCUSSION

Judgment on the pleadings involves issues of law, and our review is *de novo.* *See Mergens v.*

*Dreyfoos,* 166 F.3d 1114, 1116-17 (11th Cir.1999).

## A. *The ECOA Claim*

Enacted as part of the Consumer Credit Protection Act, *see* 15 U.S.C. §§ 1601-1693r, the ECOA proscribes discrimination in the extension of credit by making it:

unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction—

(1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract);

(2) because all or part of the applicant's income derives from any public assistance program;  or

(3) *because the applicant has in good faith exercised any right under* [*the Consumer Credit Protection Act* ].

15 U.S.C. § 1691(a) (emphasis added).  If a creditor violates § 1691(a), the ECOA provides that the aggrieved applicant, either through an individual suit or a class action, shall recover any actual damages sustained by the applicant, punitive damages, reasonable attorney's fees and costs, and any necessary equitable relief.  *See id.* § 1691e.

The TILA is part of the Consumer Credit Protection Act, and it imposes disclosure obligations upon creditors and authorizes consumers to recover both actual and statutory damages when a creditor makes inaccurate or inadequate disclosures.  *See* 15 U.S.C. §§ 1601 *et seq.*  The "right under [the Consumer Credit Protection Act]" upon which the plaintiffs base their § 1691(a)(3) ECOA claim is the purported right under the TILA to litigate, both individually and as a class action, statutory claims for disclosure violations.  They contend that First Family discriminated against them "with respect to any aspect of a credit transaction" by requiring them, as a condition of obtaining credit, to agree in advance to arbitrate any claims under the Consumer Credit Protection Act, including any claims under the TILA.

 In order to establish a violation of § 1691(a)(3), a plaintiff must show that:  (1) he exercised in good faith (2) a right under the Consumer Credit Protection Act, and (3) as a result, the creditor discriminated against him with respect to the credit transaction.  *See* 15 U.S.C. § 1691(a)(3).  An initial premise of the plaintiffs' argument in this case is that the TILA grants consumers a non-waivable right to litigate, individually and through a class action, any claims arising under the statute.  This right to litigate TILA claims, the plaintiffs maintain, is prospectively waived by the arbitration agreements that First Family requires credit applicants to sign.  Because a credit applicant would be denied credit if he declined to sign the arbitration agreement in order to preserve his right to litigate under the TILA, the plaintiffs argue that First

Family discriminates against applicants based on a good faith exercise of their rights under the Consumer Credit Protection Act, in violation of § 1691(a)(3) of the ECOA and its implementing regulation, Regulation B, 12 C.F.R. § 202.4. But how were these plaintiffs discriminated against, and for exercising what rights?

If the purported non-waivable right to litigate, instead of arbitrate, claims under the TILA exists, the complaint contains no allegation describing how these plaintiffs exercised that right. The basis for their ECOA claim is the arbitration agreement, but there is no allegation in the complaint that the plaintiffs voiced any objection to signing the arbitration agreement. In this respect, the cases cited by the plaintiffs, *Bryson v. Bank of New York,* 584 F.Supp. 1306 (S.D.N.Y.1984) and *Owens v. Magee Fin. Serv. of Bogalusa, Inc.,* 476 F.Supp. 758 (E.D.La.1979), are distinguishable. In *Owens,* the plaintiff was extended credit only after agreeing to abandon her TILA claims in a pending lawsuit that had arisen from a previous credit transaction with the defendant. *See Owens,* 476 F.Supp. at 768. In *Bryson,* the plaintiff was denied credit after he inquired into whether the written disclosure provided by the creditor accurately reflected its policy of requiring credit life insurance, a disclosure specifically required by the TILA. *See Bryson,* 584 F.Supp. at 1318-19. Pursuing TILA claims in a lawsuit and specifically inquiring into a disclosure that is required by the TILA can both reasonably be viewed as an exercises of rights under the TILA.

Even if the complaint alleged that the plaintiffs objected to the arbitration agreement, and even if we assume that such an objection somehow constitutes the requisite exercise of their rights, it is unclear what discrimination the plaintiffs suffered as result of that exercise of their rights. There is no allegation that either Bowen or Ford were refused a loan. To the contrary, the complaint alleges that both of them received a loan. Nor is there any allegation that either plaintiff paid a higher interest rate as a result of having objected to the arbitration clause—if they did object to it.

In order to establish the discrimination element of a § 1691(a)(3) claim, it may be necessary for the plaintiff to show either that the creditor refused to extend credit to the applicant or that it extended credit but on less favorable terms. In *Bryson,* for example, the plaintiff was denied the loan after inquiring into the accuracy of the bank's written disclosures. *See Bryson,* 584 F.Supp. at 1318-19. However, in *Owens,* the other ECOA case cited by the plaintiff, the district court concluded that the plaintiff had established a § 1691(a)(3) claim even though the plaintiff had been able to obtain a loan. *See Owens,* 476 F.Supp. at 768. In reaching this conclusion, the court found that the defendant had threatened to deny the plaintiff a second loan unless the plaintiff released her TILA claims arising from a previous loan. *See id.* Even if the *Owens*

decision presents a correct view of § 1691(a)(3), it may be distinguishable from this case because the plaintiffs here have not alleged that First Family threatened to refuse their loan application unless they signed the arbitration agreement, and they have not alleged that there were any pre-existing rights that had arisen in connection with a prior loan to the plaintiffs.

The plaintiffs attempt to overcome the difficulties surrounding the "good faith" exercise of rights and discrimination elements of § 1691(a)(3) by contending that one of the ECOA's implementing regulations, 12 C.F.R. § 202.4, prohibits a creditor from presenting an unlawful term as a mandatory condition of the loan agreement. We doubt that the existence of that regulation dispenses with the statutory requirements that there be an exercise of rights and discrimination resulting therefrom. But even if it does, a more basic problem for the plaintiffs, and one that we rely upon to dispose of their claim, is their position's fundamental premise that the TILA confers upon consumers a non-waivable right to litigate—as distinguished from arbitrate—claims brought under that statute.

The fact that Congress has enacted a statute which creates substantive rights and provides judicial remedies to vindicate those substantive rights does not mean it has created a non-waivable, substantive "right" to judicial redress. *Cf. American Bank & Trust Co. v. Federal Reserve Bank of Atlanta, Georgia,* 256 U.S. 350, 358, 41 S.Ct. 499, 500, 65 L.Ed. 983 (1921) (Holmes, J.) ("But the word 'right' is one of the most deceptive of pitfalls; it is so easy to slip from a qualified meaning in the premise to an unqualified one in the conclusion."). As the Supreme Court has explained repeatedly, " '[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.' " *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 26, 111 S.Ct. 1647, 1652, 114 L.Ed.2d 26 (1991) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 628, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1985)).

The ECOA protects the good faith exercise of "any right under [the Consumer Credit Protection Act]," 15 U.S.C. § 1691(a)(3), and thus, the plaintiffs can state a cognizable ECOA claim only if the TILA creates a substantive, non-waivable right to litigate the violations of substantive rights. "[I]f Congress intended the substantive protection afforded [by the TILA] to include protection against waiver of the right to a judicial forum, that intention will be deducible from text or legislative history." *Gilmer,* 500 U.S. at 29, 111 S.Ct. at 1654 (quoting *Mitsubishi Motors Corp.,* 473 U.S. at 628, 105 S.Ct. at 3354).

In arguing that the TILA provides a non-waivable right to redress in a judicial forum, the plaintiffs

point to the provision of class action remedies in § 1640(a). *See* 15 U.S.C. § 1640(a). In 1974, Congress amended § 1640 by, among other things, removing the $100 mandatory minimum statutory damage award for individuals and providing a statutory damage award specifically for class actions. *Compare id. with* 15 U.S.C. § 1640(a) (1973). The section now authorizes a class action statutory damage award of "the lesser of $500,000 or 1 per centum of the net worth of the creditor," *see* 15 U.S.C. § 1640(a)(2)(B), and provides a non-exclusive list of factors for a court to consider in determining the appropriate amount of that award. *See id.* § 1640(a).

The reason Congress amended § 1640 is that the previous mandatory minimum statutory damage award of $100 for individuals threatened creditors with "horrendous" class action liability for mere technical violations of the statute, and the prospect of that result had made courts reluctant to certify TILA claims for class treatment. *See McCoy v. Salem Mortgage Co.,* 74 F.R.D. 8, 10 (E.D.Mich.1976). Through the 1974 amendments, Congress sought to protect the financial viability of creditors by capping the amount of statutory damages in a class action, which would make courts less reluctant to certify class actions involving such claims. *See id.* ("Rather than placing the courts in a dilemma which had them choose between denying class actions altogether or permitting multi-million dollar recoveries against defendants for minor or technical violations, Congress placed a ceiling of [$500,000] or 1% of [the defendant's] net worth, whichever is less, on a defendant's statutory liability in any class action.").

The plaintiffs point out that Congress has created in TILA a class action remedy, which allows a court to consider various factors in assessing a significant statutory damage penalty against a defendant. That remedy, the plaintiffs maintain, will be lost if creditors are allowed to require consumers to arbitrate claims. The net result, they say, will be to undermine a critical statutory enforcement mechanism of the TILA.[2] In addition, pointing to legislative history which stresses the importance of class action procedures in the TILA scheme, *see* S. Rep. 93-278 (1973), the plaintiffs argue that Congress intended to guarantee consumers access to individual lawsuits and class actions to allow them to serve as private attorneys general in enforcing the provisions of the TILA, thereby furthering the policy goals of the statute. *See, e.g., Sosa v. Fite,* 498 F.2d

---

[2]We note that it is unclear whether arbitration always precludes the use of a class action procedure. *See, e.g., Johnson v. West Suburban Bank,* 225 F.3d 366, 377 n. 4 (3d Cir.2000) ("This court has never addressed the question whether class actions can be pursued in arbitral forums, though it appears impossible to do so unless the arbitration agreement contemplates such a procedure.") (citation omitted). However, both parties indicate that the arbitration agreement in this case does. For present purposes, we will assume that arbitration and a class action procedure are mutually exclusive.

114 (5th Cir.1974) ("[W]e begin with the settled proposition that congressional goals underlying the [TILA] include the creation of a system of private attorney[s] general[ ] who will be able to aid the effective enforcement of the Act.") (citation and internal marks omitted).

In regard to that argument, we recognize, of course, that a class action is an available, important means of remedying violations of the TILA. *See* 15 U.S.C. § 1640. "However, there exists a difference between the availability of the class action tool, and possessing a blanket right to that tool under any circumstance." *Wood v. Cooper Chevrolet, Inc.,* 102 F.Supp.2d 1345, 1349 (N.D.Ala.2000) (addressing, and rejecting, the same ECOA claim that is asserted in this case). An intent to create such a "blanket right," a non-waivable right, to litigate by class action cannot be gleaned from the text and the legislative history of the TILA. *See Johnson v. West Suburban Bank,* 225 F.3d 366, 377-78 (3d Cir.2000).

In *Johnson v. West Suburban Bank,* the Third Circuit addressed the language of § 1640 and explained that:

> Though the [TILA] clearly contemplates class actions, there are no provisions within the law that create a right to bring them, or evince an intent by Congress that claims initiated as class actions be exempt from binding arbitration clauses. The "right" to proceed to a class action, insofar as the TILA is concerned, is a procedural one that arises from the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 23.

*Id.* at 371; *see also Boggs v. Alto Trailer Sales, Inc.,* 511 F.2d 114, 117 (5th Cir.1975) (holding that Fed.R.Civ.P. 23 applies to TILA claims).[3] While the legislative history of § 1640 shows that Congress thought class actions were a significant means of achieving compliance with the TILA, *see* S. Rep. 93-278 (1973), it does not indicate that Congress intended to confer upon individuals a non-waivable right to pursue a class action nor does it even address the issue of arbitration.

Moreover, the fact that the TILA plaintiffs serve as "private attorneys general" in enforcing the statute does not support the plaintiffs' position that they have a non-waivable right to litigate claims, either individually or as members of a class. The Supreme Court has enforced agreements to arbitrate claims brought under RICO and under federal antitrust laws, both of which create "private attorneys general" enforcement schemes. *See Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987) (RICO); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (antitrust statutes).

---

[3]Decisions of the Fifth Circuit issued prior to October 1, 1981 are binding precedent on this Court. *See Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

As we have explained, neither the text nor the legislative history of the TILA establishes that the plaintiffs have a non-waivable right to pursue a class action, or even to pursue an individual lawsuit, as distinguished from pursuing arbitration in order to obtain remedies for violations of the statute. *See Gilmer,* 500 U.S. at 29, 111 S.Ct. at 1654 ("[I]f Congress intended the substantive protection afforded [by the TILA] to include protection against waiver of the right to a judicial forum, that intention will be deducible from text or legislative history.") (quoting *Mitsubishi Motors Corp.,* 473 U.S. at 628, 105 S.Ct. at 3354). The district court in *Wood v. Cooper Chevrolet, Inc.,* rejected virtually the same ECOA claim as that asserted in this case. *Wood,* 102 F.Supp.2d at 1350. We agree with that court's explanation that "the plaintiff[s] [have] not given up any rights or claims" by signing the arbitration agreement. *Id.* Instead, they simply have agreed "to move [TILA] claims, and all others, into an arbitral rather than a judicial forum." *Id.*

For these reasons, we agree with the other courts that have addressed this issue. *See Johnson,* 225 F.3d at 378 n. 5 *Wood,* 102 F.Supp.2d at 1350; *Thompson v. Illinois Title Loans, Inc.,* --- F.Supp.2d ---- (N.D.Ill.2000). We hold that, for purposes of the ECOA, specifically 15 U.S.C. § 1691(a)(3), Congress did not create a non-waivable right to pursue TILA claims in a judicial forum, either individually or through a class action. It follows that the plaintiffs cannot show that when First Family required them to sign an agreement to arbitrate any claims arising under the TILA, it discriminated against the plaintiffs in violation of § 1691(a)(3) because they had exercised a right under the Consumer Credit Protection Act.

Our holding goes no further than the § 1691(a)(3) issue. We have no occasion to address in this appeal whether arbitration agreements are generally unenforceable under the TILA or whether the specific agreement in this case is unenforceable. The reason we have no occasion to address those issues is that, as we explain in the next section, these plaintiffs have no standing to raise them.[4]

---

[4]Consequently, we do not reach the issue of whether an agreement to arbitrate is unenforceable with respect to TILA claims on the ground that there is "an 'inherent conflict' between arbitration and the ... underlying purposes" of the TILA. *Gilmer,* 500 U.S. at 26, 111 S.Ct. at 1652 (citing *McMahon,* 482 U.S. at 227, 107 S.Ct. at 2337). Nor do we reach the issue of whether—assuming arbitration agreements generally are enforceable with respect to TILA claims—the agreement in this case is unenforceable because it prevents a plaintiff from effectively vindicating his statutory rights, for example, by unduly limiting the types or amount of relief available, *see, e.g., Paladino v. Avnet Computer Tech., Inc.,* 134 F.3d 1054, 1060-62 (11th Cir.1998), or by imposing burdensome costs, *see, e.g., Randolph v. Green Tree Fin. Corp.,* 178 F.3d 1149, 1157-59 (11th Cir.1999), *cert. granted,* --- U.S. ----, 120 S.Ct. 1552, 146 L.Ed.2d 458 (2000).

Instead, we decide only that Congress has not conferred upon individuals a substantive, non-waivable right to judicial redress of TILA violations. Because the plaintiffs' ECOA claim, the only claim for which the plaintiffs have standing, is premised on the existence of such a right, that claim must fail.

B. *The Unenforceability Claim*

It appears that the plaintiffs contend that even if requiring customers to sign an arbitration agreement as a condition of credit is not a violation of the ECOA, the arbitration agreement in this case is unenforceable for a number of reasons.[5]  But there is no allegation that First Family has invoked, or threatened to invoke, the arbitration agreement to compel the plaintiffs to submit any claim to arbitration.  Thus, the plaintiffs lack standing to challenge the enforceability of the arbitration agreement, even though they do have standing to claim that First Family violated the ECOA by requiring them to sign the arbitration agreement in order to obtain a loan.  *See generally* 13 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure,* § 3531, at 568 (2d ed.  Supp.2000) ("A party with standing to advance one claim may lack standing to advance other claims ....");  *see also International Primate Protection League v. Administrators of Tulane Educ. Fund,* 500 U.S. 72, 77, 111 S.Ct. 1700, 1704, 114 L.Ed.2d 134 (1991) ("[S]tanding is gauged by the specific common-law, statutory or constitutional claims that a party presents.").  The difference is that the plaintiffs were required to and did sign the arbitration agreement, but there has been no occasion for First Family to attempt to enforce it against them.[6]

Under Article III of the United States Constitution, the subject matter jurisdiction of federal courts extends only to "cases or controversies."  *Socialist Workers Party v. Leahy,* 145 F.3d 1240, 1244 (11th Cir.1998).  One aspect of this "case or controversy" limitation is the doctrine of standing, which requires that the plaintiff show, among other things, that he has suffered an "injury in fact"—some harm to a legal interest that is "*actual or imminent,* not 'conjectural' or 'hypothetical[.]' "  *Id.* (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992)) (emphasis added);  *see generally National Treasury Employees Union v. United States,* 101 F.3d 1423, 1427 (D.C.Cir.1996) ("In an attempt to give meaning to Article III's case-or-controversy requirement, the courts have developed a series of principles termed 'justiciability doctrines,' among which are standing[,] ripeness, mootness, and the political

---

[5]The district court held that the arbitration agreement was "fully enforceable," which is some indication it thought that issue had been raised.  Also, in their briefs to this Court, the plaintiffs discuss enforceability beyond the general ECOA issue.  For these reasons, we will treat the issue as having been raised and argued to us.

[6]The fact that this suit was brought as a class action does not affect the plaintiffs' burden of showing that they individually satisfy the constitutional requirements of standing.  *See Griffin v.. Dugger,* 823 F.2d 1476, 1482, 1483 (11th Cir.1987) ("[A] plaintiff cannot include class action allegations in a complaint and expect to be relieved of personally meeting the requirements of constitutional standing, 'even if the persons described in the class definition would have standing themselves to sue.' ") (quoting *Brown v. Sibley,* 650 F.2d 760, 771 (5th Cir. Unit A July 1981)).

question doctrine.") (citation omitted).

A plaintiff has standing to seek declaratory or injunctive relief only when he "allege[s] facts from which it appears there is a substantial likelihood that he will suffer injury in the future." *Malowney v. Federal Collection Deposit Group,* 193 F.3d 1342, 1346-47 (11th Cir.1999) (citing *City of Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983)); *see also Whitmore v. Arkansas,* 495 U.S. 149, 158, 110 S.Ct. 1717, 1724-25, 109 L.Ed.2d 135 (1990) ("Each of these cases demonstrates what we have said many times before and reiterate today: Allegations of possible future injury do not satisfy the requirements of Art. III. A threatened injury must be 'certainly impending' to constitute injury in fact.") (citations and internal marks omitted). In this case, the plaintiffs will not be injured by the arbitration agreement unless and until it is enforced, and there are no indications of a substantial likelihood the agreement will be enforced against the plaintiffs.

To conclude that such enforcement is sufficiently imminent to entitle the plaintiffs to declaratory or injunctive relief from the agreement, we would first have to conclude that there is a substantial likelihood that First Family will take some action that at least arguably violates the TILA or some related law. However, other than their erroneous contention that being required to sign the arbitration agreement violated the ECOA, the plaintiffs have not alleged that First Family has violated any law. And we are unwilling to assume that First Family has failed or will fail to comply with the TILA or any other laws governing consumer credit transactions. But even if First Family were likely to violate the TILA or some similar law, we would also have to find there was a substantial likelihood that the plaintiffs and First Family would be unable to resolve any resulting dispute without litigation. The undeniable fact is that the vast majority of credit transactions such as the ones in this case do not result in litigation. We cannot say that enforcement of the arbitration agreement against these plaintiffs is "certainly impending," as required by *Whitmore,* 495 U.S. at 158, 110 S.Ct. at 1724-25. There is at most a "perhaps" or "maybe" chance that the arbitration agreement will be enforced against these plaintiffs in the future, and that is not enough to give them standing to challenge its enforceability. *See Malowney,* 193 F.3d at 1347.

By insisting that a plaintiff show a substantial likelihood of future injury, in the absence of declaratory or injunctive relief, courts further one of the purposes of the constitutional standing requirement—reserving limited judicial resources for individuals who face immediate, tangible harm absent the grant of declaratory or injunctive relief. *See* 13A Charles Alan Wright and Arthur R. Miller, *Federal*

*Practice and Procedure,* § 3532.1, at 114 (2d ed. 1984) ("The central perception [of the justiciability doctrines] is that courts should not render decisions absent a genuine need to resolve a real dispute. Unnecessary decisions dissipate judicial energies better conserved for litigants who have a real need for official assistance.").[7] This is certainly true with respect to suits to enjoin the enforcement of arbitration agreements. In light of the increasing use of such agreements in a wide variety of consumer transactions, as well as in the employment context,[8] requiring a plaintiff seeking relief from an arbitration agreement to demonstrate a real threat that the agreement will be invoked against him helps maintain a manageable caseload for the courts and prevents courts from becoming merely legal counselors and their adjudications merely advice. If and when First Family seeks to compel arbitration of a TILA claim, the plaintiffs can challenge the agreement as unenforceable at that time. *See Board of Trade of the City of Chicago v. Commodity Futures Trading Comm'n,* 704 F.2d 929, 933 (7th Cir.1983) (holding unripe the Board's constitutional challenge to the Commission's rule requiring arbitration of customers' common-law claims, noting that a Board employee or member who was ordered to arbitrate "could simply bring a suit to enjoin arbitration or to enjoin enforcement of an arbitration award against him on the ground that the Commission's rule requiring arbitration is invalid").

In the absence of a substantial likelihood that the arbitration agreement will be enforced against the plaintiffs, they lack standing to challenge its enforceability.

---

[7]The lack of imminent harm to the plaintiffs from the arbitration agreement can also be viewed as a constitutional problem of ripeness. "The ripeness doctrine raises both jurisdictional and prudential concerns.... It asks whether there is *sufficient injury to meet Article III's requirement of a case or controversy* and, if so, whether the claim is sufficiently mature, and the issues sufficiently defined and concrete, to permit effective decisionmaking by the court." *Cheffer v. Reno,* 55 F.3d 1517, 1524 (11th Cir.1995) (emphasis added); *see also DKT Memorial Fund v. Agency for Int'l Dev.,* 887 F.2d 275, 297 (D.C.Cir.1989) ("[T]he constitutional requirement for ripeness is injury in fact.") (citing *Duke Power Co. v. Carolina Envtl. Study Group,* 438 U.S. 59, 81, 98 S.Ct. 2620, 2634-35, 57 L.Ed.2d 595 (1978)).

Whether viewed as a problem of standing or ripeness, the result in this case is that, at this point, the speculative possibility that the arbitration agreement may be enforced against the plaintiffs is too uncertain to present a constitutional "case or controversy" with respect to the enforceability of that agreement.

[8]*See generally* Alan S. Kaplinsky and Mark J. Levin, *Consumer Financial Services Arbitration: A Panacea or a Pandora's Box?,* 55 Bus. Law. 1427, 1427 (May 2000) ("During 1999, consumer financial services companies, led by the issuers of the American Express and the Discover cards, continued to implement arbitration programs with their customers at a record pace."); Bruce P. McMoran, *The Enforceability of Mandatory Pre-Dispute Arbitration Agreements: The Battle Rages On and Some Tips on Winning,* 591 P.L.I. 1009, 1011 (1998) ("According to one report, as of the summer of 1996, the American Arbitration Association alone was helping administer the ADR programs of almost 300 large corporations, covering 3.5 million employees.")

## III. CONCLUSION

For purposes of the ECOA, specifically 15 U.S.C. § 1691(a)(3), there is no non-waivable right to litigate claims brought under the TILA. Thus, First Family's requirement that its credit applicants sign an arbitration agreement as part of the loan process, thereby prospectively waiving the applicant's right to litigate TILA claims, does not violate § 1691(a)(3). Because the plaintiffs have not alleged facts demonstrating a substantial likelihood that the arbitration agreement will be enforced against them, they do not have standing to challenge its enforceability. Consequently, although we affirm the district court's dismissal of the plaintiffs' only justiciable claim—their ECOA claim—we vacate that part of the court's order holding that the arbitration agreements between First Family and the plaintiffs are "fully enforceable pursuant to the Federal Arbitration Act."

AFFIRMED IN PART AND VACATED IN PART.

WATSON, Circuit Judge, concurring in the result.

Much of today's majority opinion is correct, and I concur with the discussion and conclusion under Part II B that plaintiffs-appellants ("plaintiffs") lack standing to challenge the enforceability of First Family's arbitration agreement. Further, I also concur with the majority's decision to affirm the district court's dismissal of plaintiffs' Equal Credit Opportunity Act ("ECOA") claim, but not the majority's holding that plaintiffs have standing with respect to that claim. Accordingly, as to Part II A of the majority's opinion, I concur only in the result.

Unlike the majority's detailed standing analysis of plaintiffs' "Unenforceability Claim" under Part II B, in which I concur, the majority's discussion of plaintiffs' standing with respect to "The ECOA Claim" under Part II A is quite scant and states only: "the plaintiffs have standing to challenge the legality of First Family's requirement that customers sign arbitration agreements as a condition of credit, because they were required to and did sign such an agreement in order to obtain credit from First Family." I disagree.

In *Allen v. Wright,* 468 U.S. 737, 755, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), the Supreme Court held that "an injury arising from discrimination 'accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct.' " I am unable to see how plaintiffs acquired standing with respect to their ECOA claim merely on the basis of the slender reed relied on by the majority. There is no suggestion whatever by the allegations of plaintiffs' complaint that First Family denied consumers equal treatment in requiring consumers to arbitrate disputes arising from the extension of credit. Similarly, the majority recognizes that "to establish the discrimination element of a §

1691(a)(3) it may be necessary for plaintiff to show either that the creditor refused to extend credit to the applicant or that it extended credit but on less favorable terms." However, here, there is no allegation either that plaintiffs were denied credit or that they were extended terms less favorable than those offered to other applicants for loans.

Apart from the absence in the complaint of any allegation of disparate treatment, also fatal to plaintiffs' standing with respect to their ECOA claim is the requirement of a "causal connection," as articulated by the Supreme Court in *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Plaintiffs have not alleged any causal connection between some asserted discriminatory conduct (*e.g.,* disparate treatment of consumers) by First Family and the claimed injury (*e.g.,* ostensibly, by being required to agree to arbitration). As recognized by the majority, the Supreme Court in *International Primate Protection League v. Administrators of Tulane Educ. Fund,* 500 U.S. 72, 77, 111 S.Ct. 1700, 114 L.Ed.2d 134 (1991), held that "standing is gauged by the specific common-law, statutory, or constitutional claims that a party presents. Typically, ... the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of *the particular claims asserted.*" *Tulane Educ. Fund,* 500 U.S. at 77, 111 S.Ct. 1700 (Emphasis in original). The Court has always insisted on strict compliance with this jurisdictional standing requirement. *Raines v. Byrd,* 521 U.S. 811, 819, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997).

Accordingly, I conclude that since plaintiffs have not alleged *inter alia,* any denial of equal treatment or causal connection, for purposes of their claim under § 1691(a)(3), plaintiffs have not alleged either that they suffered any actual or imminent injury cognizable under § 1691(a)(3), or there is any causal connection between the creditor's alleged unlawful conduct (*e.g.,* disparate treatment of consumers) and an injury (*e.g.,* ostensibly, by being required to agree to arbitration). For purposes of their discrimination claim under § 1691(a)(3), the standing requirements of injury and causal connection are not satisfied simply by plaintiffs' bald and broad brush stroke allegation that First Family violated § 1691(a)(3), or by plaintiffs' allegation that they were required to agree to arbitration of disputes with First Family.

For the foregoing reasons, I believe that the majority opinion mistakenly concludes that plaintiffs have met the constitutional minimum requirements necessary to establish standing for an ECOA claim under § 1691(a)(3). Consequently, the required federal jurisdictional foundation of a "case" or "controversy" mandated by Article III of the Constitution, which the majority finds lacking with respect to the enforceability

claim under Part II B, is also lacking with respect to plaintiffs ECOA claim addressed by the majority in Part II A.

Moreover, even assuming *arguendo* that plaintiffs have standing under § 1691(a)(3) simply because they were required to and did sign the arbitration agreement, and further assuming that the waivability of plaintiffs' right to judicial redress of TILA claims is somehow relevant to the discrimination claim, in my view, the waivability issue is not ripe for judicial resolution for essentially the same reasons advanced by the majority for not reaching the enforceability claim.  As does the majority, I recognize that in advancing their discrimination claim under § 1691(a)(3) of the ECOA, "an initial premise of plaintiffs' argument in this case is that the TILA grants consumers a non-waivable right to litigate, individually and through class action, any claims under the statute," and that "plaintiffs maintain that the right to litigate TILA claims is prospectively waived by the arbitration agreements that First Family requires credit applicants to sign."  The majority discusses the waivability issue at length, but then expressly declines to reach the issue of whether an agreement to arbitrate is enforceable.

I believe that the waivability of the right to judicial redress under TILA is reciprocally and inextricably intertwined with, and indeed, is contingent upon an *enforceable* alternative dispute resolution mechanism, such as arbitration.[1]  Indeed, a conclusion that judicial redress of TILA claims is not non-waivable subsumes *enforceable* alternative dispute resolution, and the latter subsumes the waivability of the right to judicial redress.

I agree with the majority's reasoning and conclusion in Part II B that plaintiffs do not have standing to raise the "Unenforceability Claim" unless and until the creditor seeks to enforce the arbitration agreement.  As also noted in the majority opinion, note 7, "[w]hether viewed as a problem of standing or ripeness, the result in this case is that, at this point, the speculative possibility that the arbitration agreement may be enforced against the plaintiffs is too uncertain to present a constitutional 'case or controversy' with respect to the enforceability of that agreement."  As I have concluded that waivability and enforceability are reciprocally and inextricably linked, the issue of whether plaintiffs have a non-waivable right to judicial

---

[1]If the right of judicial redress of TILA claims is "not non-waivable" (*viz.,* waivable), then *a fortiori* under the Consumer Credit Protection Act, some alternative means of dispute resolution must be available to satisfy the Act's underlying purpose of affording a means for consumers to resolve TILA claims. Generally, arbitration is encouraged to resolve disputes arising under the Acts or provisions of federal law, but I agree with the majority that the issue of enforceability of arbitration agreements should not be reached in this case for lack of standing by plaintiffs.

redress is not ripe for adjudication and must await their standing to litigate the enforceability issue, *viz.,* if and when the creditor invokes the arbitration provision.