# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 24, 2021      Decided December 28, 2021

No. 20-7081

ROBERT WEISSMAN AND PATRICK D. LLEWELLYN,
APPELLANTS

v.

NATIONAL RAILROAD PASSENGER CORPORATION, DOING
BUSINESS AS AMTRAK,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cv-00028)

*Nandan M. Joshi* argued the cause for appellants. With
him on the briefs were *Allison M. Zieve* and *Scott L. Nelson.*

*Jessica Ring Amunson* argued the cause for appellee. With
her on the brief was *Noah B. Bokat-Lindell.*

Before: ROGERS and JACKSON, *Circuit Judges*, and
SILBERMAN, *Senior Circuit Judge.*

Opinion for the Court by *Circuit Judge* ROGERS.

Concurring opinion by *Circuit Senior Judge* SILBERMAN.

ROGERS, *Circuit Judge*:  Appellants are two individuals who have traveled on Amtrak in connection with their work and expect to continue doing so.  They sought declaratory and injunctive relief to prevent Amtrak from imposing an arbitration requirement on rail passengers and purchasers of rail tickets.  The district court dismissed the complaint, finding that appellants lacked standing under Article III of the Constitution.  That is the only issue this court need address, and we affirm because appellants have not plausibly alleged an actual injury-in-fact and therefore lack Article III standing.

## I.

Congress created the National Railroad Passenger Corporation, commonly known as Amtrak, to provide passenger rail service to travelers throughout the United States. *See* Rail Passenger Service Act of 1970, Pub. L. No. 91-518, § 301, 84 Stat. 1327, 1330.  Although created by statute, Amtrak is "a private, for-profit corporation," *Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 454 (1985), "not a department, agency, or instrumentality of the United States Government," 49 U.S.C. § 24301(a)(3).

In 2019, Amtrak modified the terms and conditions that govern its rail service to include, among other things, a mandatory arbitration provision.  The provision "applies to all claims, disputes, or controversies, past, present, or future, that otherwise would be resolved in a court of law or before a forum other than arbitration," including "claims Amtrak may have against" a passenger as well as those claims a passenger may

have against Amtrak. Amtrak's Terms and Conditions 14 [JA 85]. Claims "shall be decided by a single arbitrator through binding arbitration and not by a judge or jury," and the arbitrator "shall have exclusive authority to resolve any dispute relating to the validity, applicability, enforceability, unconscionability or waiver of" the arbitration agreement. *Id.*

Robert Weissman, the president of a Washington, D.C.–based nonprofit organization, and Patrick Llewellyn, a Washington, D.C.–based attorney, sued Amtrak "to prevent [Amtrak] from imposing an arbitration requirement on rail passengers and purchasers of rail tickets," seeking declaratory and injunctive relief. Compl. ¶ 1 [JA 4]. They alleged that Amtrak's adoption of the arbitration provision was an unlawful *ultra vires* action that violated the Petition Clause, Article III, and separation-of-powers principles of the United States Constitution. *Id.* ¶¶ 28–45. Both have traveled on Amtrak between Washington, D.C. and New York City and expect to travel on Amtrak again in connection with their work, finding Amtrak to be a convenient travel option. *Id.* ¶¶ 7–10; Weissman Decl. ¶¶ 3–4, 6; Llewellyn Decl. ¶¶ 3–4, 6. They averred in separate sworn declarations that the arbitration provision deters them from riding Amtrak in the future. Weissman Decl. ¶¶ 5–6; Llewellyn Decl. ¶¶ 5–6; *see* Compl. ¶¶ 8, 10. They wish to travel on Amtrak while retaining "their right to seek judicial redress," Compl. ¶ 2, "on an individual basis or as part of a representative or class action," for any claims they might develop against Amtrak, *id.* ¶¶ 8, 10. They object to "having to agree in advance to binding arbitration before a private arbitrator and waiving [their] rights to seek a judicial remedy . . . for resolution of any claims against Amtrak." *Id.*

The district court granted Amtrak's motion to dismiss the complaint for lack of subject-matter jurisdiction, pursuant to

Federal Rule of Civil Procedure 12(b)(1). It ruled that appellants had not plausibly alleged an injury-in-fact because they had "no claim to arbitrate," only a "theoretical gripe" with the speculative risk of future arbitration, *Weissman v. Nat'l R.R. Passenger Corp.*, No. 20-cv-28, 2020 WL 4432251, at *2 (D.D.C. July 31, 2020), and consequently failed to establish standing, *id.* at *3. This appeal followed.

## II.

"Under any theory, 'the irreducible constitutional minimum of standing contains three elements': (1) the plaintiff must have suffered an 'injury in fact' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical'; (2) there must exist 'a causal connection between the injury and the conduct complained of'; and (3) it must be 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Friends of Animals v. Jewell*, 828 F.3d 989, 991–92 (D.C. Cir. 2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). A party seeking prospective declaratory and injunctive relief "must establish an ongoing or future injury that is 'certainly impending'" and "may not rest on past injury." *Williams v. Lew*, 819 F.3d 466, 472 (D.C. Cir. 2016) (quoting *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015)); *accord Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409–10 (2013). These jurisdictional prerequisites are designed to "protect[] democratic government by requiring citizens to express their generalized dissatisfaction with government policy through the Constitution's representative institutions, not the courts." *Coal. for Mercury-Free Drugs v. Sebelius*, 671 F.3d 1275, 1278–79 (D.C. Cir. 2012).

In determining, upon *de novo* review, *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015),

whether a party has standing, this court "must 'assume that on the merits [the plaintiff] would be successful in [the stated] claims,'" *Muir v. Navy Fed. Credit Union*, 529 F.3d 1100, 1106 (D.C. Cir. 2008) (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003)).

Appellants contend that the district court erred in ruling they have not suffered actual injury because Amtrak's new terms of service prevent them from purchasing tickets on the terms they would prefer. They have not sought to establish standing on the basis of imminent future injury. Reply Br. 25. Instead, they maintain that they suffer ongoing injury because purchasing a ticket with an arbitration clause "strips [them] of the ability to determine for themselves the level of risk to accept when deciding whether to enter into a commercial transaction" and they "desire not to take on *any risk of arbitration* as a condition to purchasing rail travel." Appellants' Br. 23 (emphasis added). They rely on this court's precedent that consumers have standing to challenge government action that "prevented the consumers from purchasing a desired product." *Coal. for Mercury-Free Drugs*, 671 F.3d at 1281; *see* Appellants' Br. 16–20; Reply Br. 9–14. Their reliance is misplaced.

In a series of cases conducting arbitrary-and-capricious review under the Administrative Procedure Act ("APA") or its agency-specific equivalents, this court has held that the lost opportunity to purchase a desired product constituted an injury-in-fact sufficient to confer Article III standing. *Coal. for Mercury-Free Drugs*, 671 F.3d at 1281; *see Orangeburg v. FERC*, 862 F.3d 1071, 1077–78 (D.C. Cir. 2017); *Chamber of Com. v. SEC*, 412 F.3d 133, 138 (D.C. Cir. 2005); *Consumer Fed'n of Am. v. FCC*, 348 F.3d 1009, 1012 (D.C. Cir. 2003); *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 112–13 (D.C. Cir. 1990); *Ctr. for Auto*

*Safety v. Nat'l Highway Traffic Safety Admin.*, 793 F.2d 1322, 1324 (D.C. Cir. 1986); *Cmty. Nutrition Inst. v. Block*, 698 F.2d 1239, 1246–47 (D.C. Cir. 1983), *rev'd on other grounds*, 467 U.S. 340 (1984). In each case, the court analyzed the injury-in-fact requirement by considering whether government action had meaningfully abridged a concrete interest of the plaintiff in accessing the desired product. That inquiry has focused on two considerations: whether the challenged action made a consumer's desired product, as defined by its core features, "not readily available," and whether it rendered the product "unreasonably priced." *Coal. for Mercury-Free Drugs*, 671 F.3d at 1282.

As to price, several cases concerned government action that cost the consumer money, a traditional economic injury. For example, in *Orangeburg v. FERC*, 862 F.3d 1071 (D.C. Cir. 2017), the court held that the City of Orangeburg suffered an injury-in-fact because agency action enabled the North Carolina Utilities Commission to prevent the City from purchasing wholesale power, *id.* at 1074–76, whereby the City was limited to buying power as a retail customer, a difference that annually cost the City ten million dollars, *id.* at 1078. Similarly, in *Chamber of Commerce v. SEC*, 412 F.3d 133 (D.C. Cir. 2005), a Commission rule required that mutual funds maintain a Board of Directors with at least 75% independent directors and an independent chair, *id.* at 136. The Chamber of Commerce challenged the rule, alleging that it wished to continue to invest in funds that either were chaired by management or did not meet the 75% criterion. *Id.* at 138. The court acknowledged that the rule's potential impact on the performance of funds and the availability of shares produced an injury-in-fact. *Id.* at 137; *see also Chamber of Com. v. SEC*, 443 F.3d 890, 896–97 (D.C. Cir. 2006). And in *Coalition for Mercury-Free Drugs v. Sebelius*, 671 F.3d 1275 (D.C. Cir. 2012), where an advocacy group challenged the Food and Drug

Administration's approval of thimerosal-preserved vaccines, the court acknowledged that the consumer-plaintiffs could have standing if the availability of those vaccines made them "unreasonably priced," but concluded that the allegations of an impact on price were insufficient as any slight difference in price did not necessarily establish that the price was unreasonable, *id.* at 1282–83.

As to non-economic concrete harms resulting from a product's unavailability, the court found standing in *Consumer Federation of America v. FCC*, 348 F.3d 1009 (D.C. Cir. 2003). There, the Commission's approval of the AT&T–Time Warner merger, although having no substantiated impact on cost, meant the petitioner as a consumer was allegedly left without access to a cable internet package with certain desirable features — a choice of internet service provider and unrestricted streaming content, *id.* at 1012. The desired product of cable internet with unrestricted content was therefore unavailable. *Id.* Likewise, the court held that consumers had standing to challenge agency action that restricted their opportunity to buy fuel-efficient vehicles, *Ctr. for Auto Safety*, 793 F.2d at 1332, and their opportunity to buy "larger passenger vehicles," *Competitive Enter. Inst.*, 901 F.2d at 112. In *Coalition for Mercury-Free Drugs*, the court explained that the plaintiffs had not adequately alleged that thimerosal-free vaccines were "not readily available" so as to support standing. 671 F.3d at 1282.

As Amtrak points out, this court has assumed that the lost opportunity to purchase a desired product confers standing only in the context of a challenge to government action under the APA. Even assuming that the desired-products theory could apply beyond that context, appellants misconceive the desired-products precedent.

Appellants maintain that, like the consumers in *Consumer Federation of America*, they are prevented from purchasing their desired product because an Amtrak rail ticket without an arbitration clause is no longer on the market as a result of Amtrak's new term of service. In their view, their claim is akin to the cases where government action made a consumer's desired product altogether unavailable. In those cases, however, the product at issue was differentiated from available alternatives by its core features. The consumers defined their desired product at a reasonable level of generality, tying the product to a concrete, cognizable interest, such as the ability to purchase vaccines without certain ingredients, a cable internet package without content restrictions, or cars of a certain size. So too in the cases in which consumers alleged an impact on cost: the loss of money was a concrete, traditional kind of Article III harm. Whether the harm alleged was economic or non-economic, these cases thus presented a concrete impairment of a protected interest.

By contrast, appellants' desired product is only distinguished from the available alternative by an ancillary term: the arbitration provision. They have simply reframed a general objection to mandatory arbitration as a lost opportunity to purchase a desired product. But the desired-products theory does not itself supply the ingredients of standing that a plaintiff must allege. The court's desired-products precedent represents a species of, not a substitute for, injury-in-fact, one of the basic requirements of Article III standing. *See Friends of Animals*, 828 F.3d at 991–92. Consumers proceeding on a desired-products theory must still allege a concrete invasion of a cognizable interest, and appellants have failed to do so. Appellants' allegations do not demonstrate how any harm from the mere existence of this ancillary term of service is "actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan*, 504 U.S.

at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).

Challenges to arbitration provisions in the absence of an actual arbitrable dispute (or the imminent prospect of such a dispute developing) are usually deemed nonjusticiable. *See, e.g.*, *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1019–20 (1984); *Bowen v. First Family Fin. Servs., Inc.*, 233 F.3d 1331, 1340 (11th Cir. 2000); *Bd. of Trade v. Commodity Futures Trading Comm'n*, 704 F.2d 929, 932 (7th Cir. 1983). While appellants maintain that this line of cases concerns parties who were already bound by arbitration provisions, whereas they claim injury as a result of the inability to avoid entering into such an agreement to begin with, their status as prospective customers makes their asserted injury more, not less, speculative. *See Weissman*, 2020 WL 4432251, at \*2 n.2. Nor does appellants' focus on their preference for certain "terms" solve their concreteness problem. Appellants' Br. 38–39; Oral Arg. Tr. at 7–8 (Sept. 24, 2021). The court's desired-products precedent looks to the products themselves, not the terms on which consumers must deal with sellers. A change in product terms establishes standing on a desired-products theory only insofar as it amounts to concrete harm, as in *Orangeburg*, where the City's inability to "purchase wholesale power on its desired terms" substantially increased the product's cost, 862 F.3d at 1077.

The Supreme Court has drawn similar distinctions, holding that the justiciability of a challenge to government action depends on, among other things, the nature of the conduct affected. Impositions on "day-to-day business," especially those that may incur significant cost, *see Abbott Lab'ys v. Gardner*, 387 U.S. 136, 152–53 (1967), are ripe for challenge sooner than those that do not affect such "primary conduct," *see Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S.

158, 164 (1967). That ripeness analysis "bears close affinity" to the question of standing. *Warth v. Seldin*, 422 U.S. 490, 499 n.10 (1975). Similarly, in the desired-products context, government action that makes fuel-efficient cars difficult to obtain affects a "primary," concrete consumer interest. *See Ctr. for Auto Safety*, 793 F.2d at 1332. By contrast, for example, government action that makes it more difficult to buy a car in a transaction governed by a certain choice-of-law provision affects only ancillary consumer interests resting on a "speculative chain of possibilities," *Clapper*, 568 U.S. at 414. Some impacts on desired products are too insignificant to produce Article III harm. For example, in *Coalition for Mercury-Free Drugs* this court explained that even if the consumers had adequately alleged a price differential between thimerosal-free and thimerosal-preserved vaccines, "the price differential might be sufficiently small as to have little effect on the vaccine's affordability for the average person." 671 F.3d at 1283.

Therefore, appellants have adequately alleged a "primary," concrete consumer interest in traveling on Amtrak, but not in purchasing an Amtrak ticket without an arbitration provision. Although they object that the court is "redefining" their injury at a higher level of generality, observing the court has previously taken consumers' own definitions of their desired products, Appellants' Br. 14–15, those definitions were tied to concrete, cognizable interests, not merely to ancillary and speculative interests. Even assuming that there may be "some play in the joints in selecting the right level of generality" at which to conduct the standing inquiry, that "inevitable imprecision is not an excuse for whimsy." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 542 (1995). Appellants' approach would contrive standing simply by redefining any sweeping "gripe" as the inability to obtain a product that negates that "gripe," which

would contravene a central purpose of Article III standing doctrine to channel "generalized dissatisfaction with government policy" into the political process, not the courts, *Coal. for Mercury-Free Drugs*, 671 F.3d at 1278.

Appellants protest that the court must accept their asserted interest at face value because "the inability of consumers to buy a desired product may constitute injury-in-fact 'even if they could ameliorate the injury by purchasing some alternative product.'" *Consumer Fed'n of Am.*, 348 F.3d at 1012 (quoting *Cmty. Nutrition Inst.*, 698 F.2d at 1247); Reply Br. 9–10. Even so, consumers must offer a concrete grounding for their claims, like the consumers in *Competitive Enterprise Institute v. National Highway Traffic Safety Administration*, 901 F.2d 107 (D.C. Cir. 1990), who preferred larger cars "for reasons of safety, comfort, and performance," *id.* at 112–13. No more or less is required than an injury that is "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan*, 504 U.S. at 560 (quoting *Whitmore*, 495 U.S. at 155).

Appellants rely on *Bowen v. First Family Financial Services, Inc.*, 233 F.3d 1331 (11th Cir. 2000). There, in view of allegations of unlawful discrimination under the Equal Credit Opportunity Act, 15 U.S.C. § 1691(a), the court held that consumers had standing to "challenge the legality" of a lender's "requirement that [they] sign arbitration agreements as a condition of credit," *Bowen,* 233 F.3d at 1334. Unlike appellants, the consumers' injury was not premised solely on the desire not to be bound by an arbitration agreement, but on the concrete harm peculiar to the statutory scheme of being discriminated against on the basis of their desire not to be bound by an arbitration agreement. *Bowen,* therefore, sheds little light on the asserted injury here, which has no element of discrimination.

Appellants' unbounded expansion of the desired-products theory, then, would circumvent much of modern standing doctrine, allowing abstract and speculative interests to find a footing for standing merely by reframing their injury as a lost opportunity to purchase a product. Here, appellants assert only one cognizable interest, the interest in purchasing tickets to travel by rail. Amtrak's new term of service has not meaningfully abridged that interest. Appellants therefore have not alleged ongoing injury.

Accordingly, because appellants allege neither ongoing nor imminent future injury, they lack Article III standing to seek declaratory and injunctive relief, and the court affirms the dismissal of their complaint.

SILBERMAN, *Senior Circuit Judge*, concurring:  I concur in the majority's opinion.  I write separately because I think Appellants' claim can be disposed of rather simply.

I start with the proposition that virtually every court to encounter a challenge to an arbitration clause has held:  a challenger lacks standing unless and until an incident gives rise to a plaintiff's claim and a defendant invokes the arbitration clause.  *Supra* at 9 (collecting cases).

Appellants seek to avoid this jurisdictional snare by asserting that they suffer a present injury because the product Amtrak offers, passage by rail, has been altered by inclusion of an arbitration clause.  Appellants' Br. 23.  Appellants argue that we should therefore treat their claim as we would treat a government regulatory change to an offered product.

Appellants are entitled to credit for ingenuity, but applying a little thought, their claim falls apart like a wet paper towel.  It runs afoul of a fundamental and undeniable proposition; the change complained of has to itself create an injury in fact.  And that simply brings us back to the point I started with:  an arbitration clause cannot cause injury in fact until it is invoked.

As the majority points out, the cases involving a changed product that Appellants cite are all cases in which the change itself caused a concrete injury, such as an increase in the price of the product.  The majority also notes the relevance of *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158 (1967), which, although based on ripeness, is equally applicable to standing analysis.  There, a regulation governing the sale of certain products also included an ancillary procedure for government inspections.  *Id.*  Ancillary characteristics of a product, if challenged, must have an immediate effect and of course must not be trivial to constitute injury in fact.  Like the arbitration clause here, the inspection procedure was not immediate, and

it was even uncertain what position the Commissioner would take. *Id.*

Counsel for Appellants, in an effort to slip around these barriers to standing, asserted at one point at oral argument that the present harm was based on a legal risk that Appellants would not eventually be able to challenge the arbitration clause. When asked to explain, counsel responded that it could be claimed that by buying the ticket Appellants "waived" their right to subsequently challenge the arbitration clause. That led the court to ask counsel for Amtrak whether it would ever take such a position. Counsel disclaimed, in open court, that it would do so. Of course, that would eliminate the Article III controversy. (This exchange shows the importance of oral argument.) With the court's help, counsel for Appellants retreated to his naked altered product theory—that Appellants' injury was, as initially stated, the inability to purchase an Amtrak ticket without an arbitration provision. Oral Arg. Transcript at 41:12–42:21.

But that just brought Appellants back to their basic problem. They simply abandoned one jurisdictional pothole for another.