[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
June 10, 2005
THOMAS K. KAHN
CLERK

No. 04-12420

D. C. Docket No. 04-00988-CV-1-MHS

BANKWEST, INC.,
ADVANCE AMERICA, CASH ADVANCE CENTERS OF GEORGIA,
INC.,

Plaintiffs-
Appellants,

COMMUNITY STATE BANK,
FIRST AMERICAN CASH ADVANCE OF GEORGIA, LLC,
CASH AMERICA FINANCIAL SERVICES, INC.,
GEORGIA CASH AMERICA, INC.,
FIRST BANK OF DELAWARE,
CREDITCORP OF GEORGIA, LLC,
COUNTY BANK OF REHOBOTH BEACH, DELAWARE,
EXPRESS CHECK ADVANCE OF GEORGIA, LLC,

Consolidated-Plaintiffs-
Appellants,

versus

THURBERT E. BAKER, Attorney General of the State of Georgia,
CATHY COX, Secretary of State, for the State of Georgia,
in their official capacities,

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

**(June 10, 2005)**

Before CARNES, HULL and HILL, Circuit Judges.

HULL, Circuit Judge:

This case concerns payday loans, which are small loans with interest rates averaging 400-500% APR due on the next payday.  This appeal presents the question of whether the State of Georgia may regulate a narrow segment of agency agreements between in-state payday stores and out-of-state banks or whether the Georgia Act in issue is preempted by § 27(a) of the Federal Deposit Insurance Act ("FDIA"), 12 U.S.C. § 1831d(a).

The Georgia Act in issue, Ga. Code Ann. §§ 16-17-1 to 16-17-10 (2004), targets Georgia businesses and precludes in-state payday stores from directly making payday loans in Georgia.  No one challenges Georgia's right to preclude in-state stores or even in-state banks from making payday loans at these high interest rates.

2

To avoid this direct prohibition, however, payday stores have entered into agency agreements whereby the stores procure such payday loans for out-of-state banks, but nonetheless, retain the predominate economic interest in the loans. To stop this practice, the Act restricts in-state payday stores from acting as agents for out-of-state banks in one, limited circumstance: where the agency agreement grants the in-state agent "the predominate economic interest" in the bank's payday loan, which the parties agree means that the payday stores hold more than 50% of the revenues from the loan. See Ga. Code Ann. § 16-17-2(b)(4). Georgia outlaws this one type of agency agreement to prevent in-state payday stores from circumventing Georgia's usury laws and reaping the enormous revenues from payday loans.

The district court denied the plaintiffs' motion for a preliminary injunction enjoining the enforcement of the Georgia Act. After review and oral argument, we conclude that the district court did not abuse its discretion in denying the plaintiffs preliminary injunctive relief.

## I. FACTUAL BACKGROUND

Given the complexity of this case, we first outline the principal players, the agreements at issue, and the relevant federal and state law.

### A. The Principal Players

There are two distinct sets of plaintiffs in this case. The first set of plaintiffs is the out-of-state banks, such as Community State Bank and Bankwest.[1] The out-of-state banks have no physical locations in Georgia. Rather, the out-of-state banks offer payday loans in Georgia by contracting with independent, local payday stores that form the second set of plaintiffs.

The second set of plaintiffs are corporations, such as Advance America, First American Cash Advance of Georgia, Cash America Financial Services, and others that operate payday stores in Georgia. These payday stores are not banks or subsidiaries of banks. Rather, these payday stores are wholly independent businesses with physical locations in Georgia. For example, Advance America operates 89 payday stores in Georgia.

The payday stores operate not only in Georgia but in many states. In some states, such as Florida, there is no limit on the interest rate a payday store may charge a borrower. In such states, there is no need for these plaintiff payday stores to associate themselves with out-of-state banks. Rather, they are permitted to loan money directly to borrowers and charge any interest rate they wish.

In contrast, Georgia's usury laws present a serious problem for the plaintiff

---

[1]When we use the term "out-of-state bank," we are referring to a "State-chartered insured depository institution" under Federal Deposit Insurance Act, 12 U.S.C. § 1831d(a), that is chartered in a state other than Georgia.

payday stores.  In Georgia, the maximum legal annual percentage rate ("APR") for loans of $3,000 or less is 16%.  See Ga. Code Ann. § 7-4-2(a)(2).[2]  This means that a payday store is limited to the 16% APR provided under Georgia law if it attempts to loan money directly to its customers.   However, under the § 27(a) of the FDIA, a state-chartered bank is authorized to charge the rate of interest allowed under the laws of its charter state in any other state where it does business.  Thus, an out-of-state bank is not limited by Georgia's 16% cap.

Accordingly, the local payday stores in this case have entered into arrangements with out-of-state banks to serve as their agents in Georgia.  By doing so, the payday stores are marketing and procuring the high-interest rate loans in Georgia allowed in the charter states of the out-of-state banks.

The typical scenario is that a borrower goes to a payday store in Georgia, receives a single loan payment of up to $500, and signs a promissory note or loan agreement identifying the out-of-state bank as the lender.  At the time of receiving the loan proceeds, the borrower often gives the payday store a post-dated check for the loan repayment plus finance charge.  The loan matures within four to forty-five days, usually on the borrower's next payday.  On that day, the borrower must

---

[2]For loans involving more than $3,000 the maximum legal rate of interest is 5% per month.  See Ga. Code Ann. § 7-4-18(a).

repay the principal, plus a finance charge of 17% to 27% of the principal, depending on the term of the loan. When the finance charge is calculated as an APR, it far exceeds the maximum permitted under Georgia law. In fact, the charges on a typical two-week payday loan have an APR between 442% and 520%.

The payday stores maintain many physical locations in Georgia and pay all costs associated with maintaining those locations, including rent, equipment costs, staffing costs, taxes, and advertising. Although the out-of-state bank advances the initial loan funds, the payday stores market the loans, process applications, collect loans after maturity, submit reports about the loans to the out-of-state bank, and remit the loan payments to a local bank account in the out-of-state bank's name. As detailed later, the payday stores effectively do all the work and retain 81% of the loan revenues.

The defendant in this case is, essentially, the State of Georgia. As discussed below, the State of Georgia prohibits Georgia-licensed businesses, such as the plaintiff in-state payday stores from (1) making payday loans directly to borrowers, and (2) acting as agents when paid the predominate economic interest in the payday loan.

## B. The Contracts

Just as there are two types of plaintiff in this case, there are two types of contract. First, there is the contract between the out-of-state bank and the borrower. The relationships between the out-of-state banks and the borrowers are governed by written loan contracts. In the consumer loan contract provided by plaintiff Bankwest, which we have been led to believe is typical, Bankwest is identified as "the Lender" and Advance America, the payday store, is identified as "the fiscal agent and loan marketer/servicer." The loan contract discloses the APR of the loan, the total finance charge, the amount of the loan, and the total amount that will have to be repaid by the borrower. The first page of the loan contract, which contains all of the financial terms of the loan, is signed by only the borrower and Bankwest.[3] Thus, Bankwest, as the lender, sets the terms and features of the loans.

Second, there is also the entirely separate contract between the in-state payday store and the out-of-state bank. It is the in-state payday stores' agency relationships that the State of Georgia has attempted to regulate, but only when the payday store retains the predominate economic interest in the loan revenues.

The agreement between plaintiffs Advance America (an in-state payday

---

[3]The second and final page of the loan contract contains an arbitration agreement, which must be signed by the borrower, Bankwest, and Advance America.

7

store) and Bankwest (an out-of-state bank) is in the record, and again we have been led to believe that it is typical. Under the agreement, Advance America pays for all costs related to its storefront locations and employees.[4] Advance America procures the borrower and submits a loan application to Bankwest. Bankwest then approves (or denies) the application and advances all funds. Bankwest uses a separate third-party "loan processing agent" (referred to as "Tele-Track" in the record) to electronically approve applications.[5]

In addition, if a borrower does not pay back the loan, the agreement transfers part of the loan loss to Advance America.[6] Every three months, the total amount of Bankwest loans that Advance America cannot collect (known as loan loss) is calculated. If the loan loss is 8.5% or less of the total amount of the finance charges (which are 17% of the loan) over that period, then Bankwest

---

[4]The costs include all rental and occupancy costs, up-front and leasehold improvements, equipment costs, processing costs, printing costs, maintenance costs, staffing costs, taxes, signage costs, and advertising. The agreement between Bankwest and Advance America does not contain any provisions allowing Bankwest to train, supervise, or monitor Advance America's employees who deal with the borrowers and collect the loans. Further, the agreement provides that Advance America has the duty and responsibility of complying with all federal and state laws when collecting loans. It is undisputed that Bankwest and Advance America are wholly separate entities.

[5]Tele-Track is an automated-consumer-information database that Advance America also uses in other states where Advance America makes loans in its own name.

[6]Bankwest "owns" all the loans initially, but retains the right to sell a loan to any third party; Advance America, as the payday store has a right of first refusal on any loan that Bankwest chooses to sell.

absorbs the loss.[7]  That means Bankwest absorbs the first 1.45% (8.5% of 17%) of the total loan amounts.  However, if the loan loss exceeds 8.5% of the finance charges, Bankwest reduces the amount owed to Advance America for its services by that excess up to 13.8% of the total loans made.  In other words, Bankwest absorbs the loans losses up to the point where they equal 1.45% of the total loans, and Advance America absorbs the losses to the extent they exceed 1.45% up to 13.8% of the total loans.  If the loan losses exceed 13.8% of the total loans, Bankwest bears the remaining risk of loss.[8]

Further, the agreement allocates the loan revenues largely to Advance

---

[7]The agreement between Bankwest and Advance America states:
The Bank has established a standard to monitor the effectiveness of collection efforts of Advance America.  The Bank requires that loan losses to the Bank on the Loans shall be eight and one half percent (8.5%) or less of the amount of the finance charge on the Loans, as the finance charge is disclosed in the federal Truth in Lending box contained in the Notes (the "Loss Rate Standard").  Advance America agrees to meet the Loss Rate Standard in its collections.  If Advance America's collection efforts do not meet this Loss Rate Standard established by the Bank, the Fees (as that term is defined in Section 2(g) below) to be paid Advance America for marketing and servicing the Loans as the Bank's fiscal agent will be reduced by the dollar amount that the loan losses exceed the Loss Rate Standard.  The Fees will be adjusted in accordance with this Section on a quarterly basis based on the calendar year to date loss experience.

[8]The record reflects that for the 14-month period just before the filing of the motion for injunction, "the Loss Rate Standard on the aggregate portfolio of loans made by BankWest to Georgia borrowers was approximately 12.5%.  Thus, BankWest was responsible for approximately 68% of all loan losses incurred during that period."  In turn, Advance America was responsible for approximately 32% of all loan losses.  Thus, it is not disputed that the agency agreement between Bankwest and Advance America makes Advance America responsible for part of the loan losses on the payday loans.

9

America. The agreement states that the maximum amount of any loan is $1,000 and that borrowers are charged $17 for every $100 borrowed.[9] That is the finance charge. Advance America's total compensation is a $13.80 "marketing and servicing fee" for every $100 advanced to a borrower.[10] As a result, Advance America, the payday store, receives 81% ($13.80 out of $17) of the loan revenues generated by the finance charge. The parties do not dispute the fact that, under their agency agreements with the out-of-state banks, the plaintiff payday stores have the predominate economic interest in the revenues generated by the payday loans in issue.

## C.    The Relevant Federal and State Law

### 1.    Federal Law

As noted earlier, in Georgia, there is a 16% cap on the interest rate that in-state payday stores, and <u>even in-state banks</u>, may charge for loans under $3,000. Georgia, however, cannot prevent an <u>out-of-state bank</u> from charging its higher home-state interest rates because § 27(a) of the FDIA authorizes a state-chartered bank to charge the interest rates allowed under the laws of its charter state in any

---

[9] The agreement actually states that the maximum loan amount is "One thousand ($500) [sic] dollars." The typo in the agreement is not relevant to any of the issues we are discussing.

[10] Exhibit A to the agreement states that Advance America's fee for collected loans is "$13.80 per $100.00 loaned."

other state where it does business. Specifically, FDIA § 27(a) covers "any loan" of the out-of-state bank but addresses solely the interest-rate element of the loan, as follows:

> In order to prevent discrimination against State-chartered insured depository institutions, . . . such State bank . . . may, notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section, . . . charge on any loan . . . interest . . . at the rate allowed by the laws of the State . . . where the bank is located . . . .

12 U.S.C. § 1831d(a).

Georgia recognizes that the plaintiff out-of-state banks in this case are authorized to charge the high-interest rates of 400-500% under the laws of their charter states.[11]  Given § 27(a), Georgia cannot regulate or restrict out-of-state banks acting for themselves from charging these high-interest rates on out-of-state bank loans in Georgia.  Georgia does not dispute that "any" means "any loan" of the out-of-state bank.  As explained later, this is why Georgia has exempted out-of-state banks throughout the payday loan Act in issue.

### 2.    State Law

What Georgia says it has the power to regulate in the Act are in-state payday stores in these two ways: (1) to prohibit in-state payday stores from making

---

[11]Plaintiff Bankwest and Community State Bank are chartered in South Dakota.  Plaintiffs First Bank of Delaware and County Bank of Rehoboth Beach are chartered in Delaware.  Both of these states permit their state banks to charge these high-interest rates of 400-500%.

payday loans directly to borrowers; and (2) to restrict in-state payday stores from acting as agents for exempt entities in the one circumstance where the in-state payday store holds the predominate economic interest in the payday loans.

Specifically, in April 2004, the Georgia legislature enacted Senate Bill 157, 2004 Ga. Laws 440, now codified in Georgia Code Ann. §§ 16-17-1 to 16-17-10. The Act contains findings that even though the Georgia Attorney General had deemed payday loans with excessive interest rates to be illegal under previously existing state law, and even though the Georgia Industrial Loan Commissioner had issued cease-and-desist orders to payday stores, the payday stores have continued their usurious practices. Ga. Code Ann. § 16-17-1(b).[12] The purpose of the Act, according to the legislative findings contained within it, is to provide "sufficient deterrents" to "cause this illegal activity to cease." Id.

The Act declares payday loans unlawful in Georgia. Specifically, the Act declares it "unlawful for any person to engage in any business . . . which consists in whole or in part of making, offering, arranging, or acting as an agent in the making of loans of $3,000 or less" if that loan violates, among other things,

_____

[12]The Georgia Act declares that "payday lending . . . is having an adverse effect upon military personnel, the elderly, the economically disadvantaged, and other citizens of the State of Georgia." Ga. Code Ann. § 16-17-1(c).

12

Georgia's usury laws.  Id. §§ 16-17-2(a), (a)(1)(E), (a)(1)(G).[13]  Although § 16-17-2(a) of the Act declares these payday loans unlawful, § 16-17-2(a)(3) grants an explicit exception to out-of-state banks under this section of the Act.  See Ga. Code Ann. § 16-17-2(a)(3).[14]  Thus, the Act does not prohibit out-of-state banks from making payday loans at high-interest rates in Georgia.

---

[13]The Act declares that payday loans are unlawful if they violate any number of Georgia's consumer protection laws.  Specifically, § 16-17-2(a) states:

It shall be unlawful for any person to engage in any business, in whatever form transacted, including, but not limited to, by mail, electronic, the Internet, or telephonic means, which consists in whole or in part of making, offering, arranging, or acting as an agent in the making of loans of $3,000.00 or less unless:
(1) Such person is engaging in financial transactions permitted pursuant to:
(A) The laws regulating financial institutions as defined under Chapter 1 of Title 7, the "Financial Institutions Code of Georgia";
(B) The laws regulating state and federally chartered credit unions;
(C) Article 13 of Chapter 1 of Title 7, relating to Georgia residential mortgages;
(D) Chapter 3 of Title 7, the "Georgia Industrial Loan Act";
(E) Chapter 4 of Title 7, relating to interest and usury;
(F) Chapter 5 of Title 7, "The Credit Card and Credit Card Bank Act," including financial institutions and their assignees who are not operating in violation of said chapter; or
(G) Paragraph (2) of subsection (a) of Code Section 7-4-2 in which the simple interest rate is not greater than 16 percent per annum;
(2) Such loans are lawful under the terms of:
(A) Article 1 of Chapter 1 of Title 10, "The Retail Installment and Home Solicitation Sales Act";
(B) Article 2 of Chapter 1 of Title 10, the "Motor Vehicle Sales Finance Act"; or
(C) Part 5 of Article 3 of Chapter 12 of Title 44, relating to pawnbrokers . . . .

Ga. Code Ann. § 16-17-2(a)(1) - (a)(2).

[14]Payday loans are illegal in Georgia unless they are issued by a "bank chartered under the laws of another state and insured by the Federal Deposit Insurance Corporation . . . [that] is not operating in violation of the federal and state laws applicable to its charter . . . ."  Ga. Code. Ann. § 16-17-2(a)(3).

Further, the main purpose of the Georgia Act is to regulate in-state payday lenders and not out-of-state banks. The Act exempts out-of-state banks from the definition of payday lenders and payday lending, § 16-17-1(a);[15] it explicitly exempts out-of-state banks from the prohibited-conduct sections, §§ 16-17-2(a) and (b); it exempts out-of-state banks from the provision regulating choice of law and choice of forum clauses in loan contracts, § 16-17-2(c)(1);[16] it exempts out-of-state banks from the civil monetary penalties in §§ 16-17-3 and 16-17-4 because those provisions are limited to only violations of §§ 16-17-2(a) and (b), which exempt out-of-state banks; it revokes the business license of Georgia businesses and only if they engage in "payday lending," the definition of which excludes out-of-state banks, §§ 16-17-7, 16-17-1(a); it designates the site or location where "payday lending" takes place in Georgia a public nuisance and out-of-state banks are exempt from the definition of payday lending, §§ 16-17-8, 16-17-1(a). In

---

[15]Section 16-17-1(a) defines payday lending and payday lenders for the purposes of the remainder of the Act. Payday lending is defined as "all transactions in which funds are advanced to be repaid at a later date . . . ." Ga. Code. Ann. § 16-17-1(a). Payday lenders are defined as "one who engages in such transactions." Id. The first section of the Act then exempts out-of-state banks from the definitions of both payday lending and payday lenders and states: "This definition of 'payday lending' expressly incorporates the exceptions and examples contained in subsections (a) and (b) of Code Section 16-17-2." Ga. Code. Ann. § 16-17-1(a); see § 16-17-2(a)(3).

[16]For example, § 16-17-2(c)(1) is limited to "payday lender." As explained above, the Act exempts out-of-state banks from the definition of payday lender, and, thus, § 16-17-2(c)(1) has no application to out-of-state banks.

14

short, the Act attempts to regulate in-state payday lenders and not out-of-state banks.

In addition to prohibiting in-state payday stores from making payday loans directly, Georgia has declared agency arrangements between payday stores and exempt entities, where the payday store has "the predominant economic interest" in the loan revenue, to be an unlawful scheme or contrivance designed to allow the in-state payday stores to circumvent Georgia's usury laws. Specifically, Georgia

> declares that the use of agency or partnership agreements between in-state entities [payday stores] and out-of-state banks, whereby the in-state agent holds a predominate economic interest in the revenues generated by the payday loans made to Georgia residents, is a scheme or contrivance by which the agent seeks to circumvent . . . the usury statutes of this state.

Ga. Code. Ann. § 16-17-1(c). It is this single type of agency or partnership relationship that Georgia regulates by the Act. Georgia has done so to prevent in-state payday stores that keep the predominate economic interest in local payday loans from circumventing Georgia's 16% cap by partnering with out-of-state banks.

Section 16-17-2(b)(4) of the Act explicitly makes "[a]ny arrangement by which a de facto lender [payday store] purports to act as the agent for an exempt entity [out-of-state bank]" unlawful if the "entire circumstances of the transaction

15

show that <u>the purported agent holds, acquires, or maintains a predominant economic interest in the revenues generated by the loan</u>."  <u>Id.</u> § 16-17-2(b)(4) (emphasis added).  The predominate economic interest requirement is fulfilled by one criteria: the in-state payday store receives over 50% of the revenue from the loan.  <u>Id.</u>[17]

Because the prohibited agency conduct in § 16-17-2(b)(4) is subject to the exceptions in § 16-17-2(a), the Act also specifically exempts out-of-state banks from the reach of § 16-17-2(b)(4).  <u>See</u> <u>id.</u> §§ 16-17-2(a)(3), (b).  Again, the Act targets the conduct of in-state payday stores, not out-of-state banks.

Thus, the Act has no application when out-of-state banks act for themselves or act through an in-state agent (even a payday-store agent) who is paid less then 50% of the revenue from a payday loan.  If, however, an out-of-state bank enters into an agreement with an in-state payday store that allows the independent payday store to have the predominate economic interest (by earning more than 50% of the revenue from a payday loan), the payday store, <u>and not the out-of-state bank</u>, is liable for damages under the Act.  Although the Act does not empower

---

[17]The parties do not dispute that § 16-17-2(b)(4) affects only those transactions in which the plaintiff payday store has "the predominate economic interest" in the revenues from the payday loan.  The parties also do not dispute that under the secondary agreements at issue, the plaintiff payday stores receive more than 50% of the revenues from the payday loan, and, thus, have the predominate economic interest in the payday loan.  The question, thus, is whether Georgia can preclude in-state payday stores from entering into these agency agreements.

Georgia to prosecute an out-of-state bank directly as a principal party to the agency agreement, the Act does prohibit the in-state agent, acting pursuant to an unlawful contract, from collecting the payday loans and declares that the payday loans procured by the in-state payday store are void ab initio. See Ga. Code Ann. § 16-17-3.

In addition, § 16-17-2(d) of the Act imposes penalties on payday stores that: (1) make payday loans directly in their own name; or (2) undertake to make prohibited secondary agreements between themselves and out-of-state banks, whereby the payday stores maintain the predominate economic interest from payday loans made in the bank's name.[18] See id. § 16-17-2(d).

## II. PROCEDURAL HISTORY

Immediately after the Georgia Act was enacted on April 9, 2004, the payday stores and out-of-state banks filed a total of four lawsuits against the Georgia Attorney General, the Georgia Secretary of State, or both of them, seeking temporary restraining orders and preliminary and permanent injunctions against

---

[18]The Act provides that any individual borrower or class of borrowers whose payday loan was procured pursuant to an illegal contract between a payday store and an out-of-state bank can sue the payday store for "three times the amount of any interest or other charges to the borrower," and the court must award successful plaintiffs attorneys' fees as well as costs. Ga. Code Ann. § 16-17-3. In addition, the State may bring an action for civil penalties against payday stores who violate subsections (a) or (b) "equal to three times the amount of any interest or charges to the borrowers in the unlawful transactions." Id. § 16-17-4(a). The out-of-state banks, however, are not subject to these civil penalties in § 16-17-3 or § 16-17-4(a).

enforcement of the Act, as well as declaratory judgments that the provisions of the Act that apply to them are preempted by federal law and are unconstitutional. The district court consolidated the four cases and heard argument on the motions for preliminary injunction. Because the Act was scheduled to go into effect on May 1, 2004, the district court entered a temporary restraining order prohibiting enforcement against the plaintiffs until May 15, 2004.

Two days before the scheduled expiration of the TRO, the district court denied the plaintiffs' motions for a preliminary injunction and refused to enter an injunction pending appeal.[19] The district court found that the plaintiffs did not demonstrate a likelihood of success on the merits as to any of their claims. The district court also decided that the balance of harms favored Georgia and weighed against issuing an injunction, and that enjoining enforcement of the Act would harm the public interest. The district court did find that the plaintiffs would be irreparably harmed if the Act were enforced against them, and the parties do not

---

[19]To qualify for a preliminary injunction, the lenders had to show: (1) a substantial likelihood of success on the merits; (2) that they would suffer irreparable injury without the injunction; (3) that the threatened injury outweighed whatever damage the injunction would cause the State of Georgia; and (4) that, if issued, the injunction would not be adverse to the public interest. See Four Seasons Hotels & Resorts v. Consorcio Barr, 320 F.3d 1205, 1210 (11th Cir. 2003). A "preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly carries the burden of persuasion" on these four elements. United States v. Jefferson County, 720 F.2d 1511, 1519 (11th Cir. 1983) (internal quotation marks and citation omitted).

18

dispute that finding.[20]

The plaintiffs filed notices of appeal as well as motions asking this Court to issue an injunction pending appeal. We denied the motions for an injunction pending the appeal but did expedite the appeal. As things stand now, the Act has been in effect since May 25, 2004, when the district court's extended TRO expired.

### III. STANDARD OF REVIEW

We generally review the district court's denial of an injunction only for an abuse of discretion. See Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l, 238 F.3d 1300, 1308 (11th Cir. 2001). However, determinations of law made in the course of denying a preliminary injunction are reviewed de novo. Bailey v. Gulf Coast Transp., Inc., 280 F.3d 1333, 1335 (11th Cir. 2002). "'A district court by definition abuses its discretion when it makes an error of law.'" United States v. Pruitt, 174 F.3d 1215, 1219 (11th Cir. 1999) (quoting Koon v. United States, 518 U.S. 81, 100, 116 S. Ct. 2035, 2047 (1996)). As to findings of fact made in the course of denying a preliminary injunction, "the trial court is in a far better position than this Court to evaluate [the] evidence, and we will not disturb its factual findings unless they are clearly erroneous." Cumulus Media, Inc. v. Clear

---

[20]The district court did extend the TRO until May 25, 2004.

19

Channel Communications, Inc., 304 F.3d 1167, 1171 (11th Cir. 2002) (internal citations omitted).

## IV. DISCUSSION

The plaintiffs raised five claims in the district court but press only three of them here. Those three claims are that the Georgia Act: (1) is preempted by § 27(a) of the FDIA; (2) violates the dormant Commerce Clause; and (3) violates the Federal Arbitration Act. Before discussing these issues, we address what deference is due to Federal Deposit Insurance Corporation ("FDIC") positions regarding preemption.

## A.    Chevron

The parties dispute what position the FDIC has taken on the preemption issue here. The out-of-state banks and payday stores point to certain statements made by various FDIC officials suggesting one view and Georgia points to various other documents that it suggests indicate that the FDIC has a different view on the preemption issue. However, the threshold issue for us is whether the FDIC's view is entitled to deference under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S. Ct. 2778 (1984).[21]

---

[21]The plaintiffs filed the transcript as supplemental authority. Georgia has moved to strike the transcript, arguing that it is not a proper supplemental authority under Fed. R. App. P. 28(j). Because the transcript does not affect our conclusion, we deny Georgia's motion as moot.

20

Putting aside the question of what the FDIC's position is, see Christensen v. Harris County, 529 U.S. 576, 587, 120 S. Ct. 1655, 1662-63 (2000) (interpretations in opinion letters, policy statements, manuals, and the like do not warrant Chevron deference), it is clear to us that no deference is due.

The reason is that we do not defer to agency positions, whether formal or informal, on preemption issues. See Smiley v. Citibank (South Dakota), 517 U.S. 735, 744, 116 S. Ct. 1730, 1735 (1996) (distinguishing between the "substantive (as opposed to pre-emptive) meaning of a statute," on which deference must be granted, and "the question of whether a statute is pre-emptive"); see also Nat'l Mining Ass'n v. Sec'y of Labor, 153 F.3d 1264, 1267 (11th Cir. 1998) (citing Colo. Pub. Utils. Comm'n v. Harmon, 951 F.2d 1571, 1579 (10th Cir. 1991)). Because "a preemption determination involves matters . . . more within the expertise of the courts than within the expertise of" an administrative agency, we need not defer to an agency's opinion regarding preemption. Colo. Pub. Utils. Comm'n, 951 F.2d at 1579. That side issue settled, we turn now to our own determination of the preemption issue.

## B.    Preemption

There are three types of preemption: express preemption, field preemption, and conflict preemption. Express preemption occurs when "Congress has

21

manifested its intent to preempt state law explicitly in the language of the statute."

Cliff v. Payco Gen. Am. Credits, Inc., 363 F.3d 1113, 1122 (11th Cir. 2004). Field preemption occurs when "federal regulation in a legislative field is so pervasive that we can reasonably infer that Congress left no room for the states to supplement it . . . ." Id. Conflict preemption arises either when "it is impossible to comply with both federal and state law" or "when state law stands as an obstacle to achieving the objectives of the federal law." Id. Because the field preemption and conflict preemption issues are easily resolved, we address them first.

## C.  Field Preemption

With regard to field preemption, it is clear that the FDIA was not intended to "occupy the field" of state bank regulation. In the case of state-chartered banks, the FDIA itself makes it clear that while state banks are subject to some federal regulation, the states remain the "primary regulatory authority" over state banks participating in the FDIC's deposit insurance program. See, e.g., 12 U.S.C. §§ 1813(r) (defining "State bank supervisor" as state officer, agency, or other entity with primary regulatory authority over state banks); 1820(h)(1)(A) (granting State bank supervisor regulatory authority over state banks with respect to state laws governing, among other things, fair lending and consumer protection); 1831a(i)

(providing that section governing activities of insured state banks "shall not be construed as limiting the authority of . . . any State supervisory authority to impose more stringent restrictions").[22]

Although § 27(a) authorizes state banks to export their home interest rate to another state, the FDIA expressly acknowledges that the host state's consumer and fraud laws still apply to the exporting state banks.  12 U.S.C. § 1820(h)(1)(A) (providing that the state bank supervisor may examine branches operated in such state by an out-of-state bank "for the purpose of determining compliance with host state laws, including those governing banking, community reinvestment, fair lending, consumer protection, and permissible activities").  Indeed, the activities

---

[22]The dissent emphasizes the heavy federal presence in national banking, but inappropriately, in our view, marginalizes the role of states in banking matters.  The centerpiece of the federal banking laws is the National Banking Act of 1864 ("NBA"), which establishes that national banks are free from state interference and subject to only federal banking regulations. National banks are endowed by federal law with "all such incidental powers as shall be necessary to carry on the business of banking."  12 U.S.C. § 24 Seventh.  However, the NBA does not govern or protect state banks.  Furthermore, there is no corresponding grant of "all incidental powers" to state banks in the FDIA as there is to national banks in the NBA.

In contrast to the broad protection provided under the NBA, the FDIA created the FDIC for the purpose of protecting customers of failed banks by making deposit insurance available to qualified state and federal lending institutions.  Nonetheless, as explained above, states and state laws, not the FDIC and the FDIA, remain the primary regulators of state banks.

The dissent also emphasizes that the heavy federal presence in national banking and the excessive federal regulation of national interest rates extend as far back as 1864 with the enactment of the NBA, and that § 27(a) of the FDIA "mirrors" § 85 of the NBA.  However, the NBA regulates the interest rates of national banks, and § 27(a) of the FDIA (affecting state banks) was not enacted until 1980, and the FDIA, unlike the NBA, expressly preserves the state's traditional powers over state banks.

23

of state banks are areas that traditionally have been regulated by the states. See

Lewis v. BT Inv. Managers, Inc., 447 U.S. 27, 38, 100 S. Ct. 2009, 2016 (1980).

For example, states have authority to regulate the establishment of in-state

branches of banks and their activities. See e.g., 12 U.S.C. § 1831u(a)(4) - (5).

Therefore, we readily conclude that there is no field preemption of the State's

power to regulate state banks.

**D.    Conflict Preemption**

With regard to conflict preemption, this is not a case where compliance with

both the state and federal laws is impossible. As in Barnett Bank of Marion

County v. Nelson, "[t]he two statutes do not impose directly conflicting duties on

[state] banks – as they would, for example, if the federal law said, 'you must

[export your home-state interest rate],' while the state law said, 'you may not.'"

517 U.S. 25, 31, 116 S. Ct. 1103, 1108 (1996). Therefore, the conflict preemption

question turns on whether the Act "stands as an obstacle to achieving the

objectives of the federal law," Hughes v. Att'y Gen. of Florida, 377 F.3d 1258,

1265 (11th Cir. 2004) (citing Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363,

372-73, 120 S. Ct. 2288, 2294 (2000) and Cliff, 363 F.3d at 1122), or whether the

Act substantially impairs the right created by the federal law. Barnett Bank, 517

U.S. at 33, 116 S. Ct. at 1109. For the following reasons, the Act does not stand as

24

an obstacle to achieving this objective or substantially impair the right created by the federal law, and, therefore, there is no conflict preemption.

First, and most important, the Act provides a complete exemption to out-of-state banks for liability under the Act. <u>See</u> Ga. Code. Ann. §§ 16-17-2(a)(3), (b). Therefore, out-of-state banks acting for themselves are free to charge Georgia borrowers their home state interest rates as authorized by § 27(a) of the FDIA without being subject to any liability under the Act.

Second, the Act does not prohibit out-of-state banks from using independent agents, including payday stores, or other partnerships to make payday loans at their home-state interest rates in Georgia. Rather, the Act restricts out-of-state banks from only one limited type of agency: using a separate, in-state business entity in Georgia that holds "a predominant economic interest" in the loan revenues. Ga. Code Ann. § 16-17-2(b)(4).

In addition, the Act leaves open other alternatives for out-of-state banks to export their home-state interest rates to Georgia borrowers. Given modern technology and communications in today's economic world, out-of-state banks have a plethora of distribution channels to use in exporting their home state interest rates to Georgia borrowers.

In sum, nothing in the language of § 27(a) gives out-of-state banks the sole

and exclusive right to use independent, in-state payday stores as agents or to define the nature of their relationship with those payday stores. Consequently, we conclude that there is no conflict preemption.

## E. Express Preemption

### 1. Section 27(a) Preempts State Law

As stated above, express preemption occurs when "Congress has manifested its intent to preempt state law explicitly in the language of the statute." Cliff, 363 F.3d at 1122. Section 27(a) of the FDIA states that "notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section," an out-of-state bank may charge on any loan the rate of interest allowed by the laws of its charter state. 12 U.S.C. § 1831d(a). Therefore, this is obviously a case in which the federal statute preempts some forms of state law.

Because this is an express preemption case, § 27(a) preempts "something" and precludes state laws on that "something." Accordingly, the question is whether the language of § 27(a) preempts the Georgia Act, not whether Congress intended to preempt state legislation when enacting § 27(a). In turn, this case presents two sub-questions of statutory interpretation that must be answered. The first question is what is the scope of the express preemption accomplished by § 27(a)'s plain language which provides that a "State bank . . . may . . . charge on

26

any loan . . . interest . . . at the rate allowed by the laws of the State . . . where the bank is located." 12 U.S.C. § 1831d(a). The second question is whether the Georgia Act falls within the scope of § 27(a).

## 2.    Statutory Interpretation Principles

When Congress expressly codifies its preemptive intent in statutory form, our analysis "begins with the language of the statute." Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 542, 121 S. Ct. 2404, 2415 (2001). Our task of statutory interpretation must also be guided by Medtronic, Inc. v. Lohr, 518 U.S. 470, 484, 116 S. Ct. 2240, 2250 (1996), where the United States Supreme Court addressed a federal statute that "expressly pre-empts state law." The Supreme Court noted that in such express-preemption situations "our interpretation of [the preemptive] language does not occur in a contextual vacuum. Rather, that interpretation is informed by two presumptions about the nature of pre-emption." Id. at 485, 116 S. Ct. at 2250.

"First, because the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law . . . , particularly in those [areas] in which Congress has legislated in a field which the States have traditionally occupied." Id. (internal quotation marks, punctuation, and citations omitted). In such situations, it is important to give the statute a

narrow construction in order to be consistent with both federalism concerns and the historic primacy of state regulation. See id.; Cipollone v. Liggett Group, Inc., 505 U.S. 504, 518, 121 S. Ct. 2608, 2618 (1992). As noted earlier, states and state regulators have traditionally regulated state banks, and remain the primary regulatory authority.

Second, the Supreme Court has instructed that in interpreting a federal statute, including one that expressly preempts state law, federal courts must consider Congressional intent and purpose, as these are the "touchstone in every pre-emption case." Medtronic, 518 U.S. at 485, 116 S. Ct. at 2250 (internal quotation marks and citations omitted).

> As a result, any understanding of the scope of a pre-emption statute must rest primarily on a fair understanding of *congressional purpose.* Congress' intent, of course, primarily is discerned from the language of the pre-emption statute and the "statutory framework" surrounding it. Also relevant, however, is the structure and purpose of the statute as a whole, as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law.

Id. at 485-86, 116 S. Ct. at 2250-51 (internal quotation marks and citations omitted).

The Supreme Court has set out the governing framework courts should follow.

> In these cases, our task is to identify the domain expressly pre-empted, because an express definition of the preemptive reach of a statute supports a reasonable inference that Congress did not intend to pre-empt other matters. . . . Because federal law is said to bar state action in a field of traditional state regulation. . . we work on the assumption that the historic police powers of the States are not to be superseded by the Federal Act unless that is the clear and manifest purpose of Congress.

Lorillard Tobacco, 533 U.S. at 541-42, 121 S. Ct. at 2414 (internal quotations, citations, and punctuation marks omitted). We now turn to the language of § 27(a).

### 3. Scope of § 27(a)

According to the plain language of § 27(a), the domain of law expressly preempted by § 27(a) are state laws which prohibit:

1. a State bank;

2. from charging interest at the rate allowed by the home State;

3. on any loan.

The language of § 27(a) refers only to state banks, and does not address non-bank businesses, such as payday stores, at all.

Even as to "any" loan of state banks, the language of § 27(a) does not mention any other element or term of the loan other than interest rates. Importantly, it does not mention any collateral activity associated with the loan, such as marketing, advertising, solicitation, or any aspect of the loan procurement

29

process.  It does not mention collection practices associated with the loan.  Indeed, it is not disputed that state consumer protection and fraud laws may regulate an out-of-state-bank's activities <u>associated with its loan</u>.  Further, nothing in § 27(a) regulates separate contracts between out-of-state banks and in-state vendors to which the borrower is not even a party (such as the agency agreements here).  The apparent clarity of § 27(a)'s language is, at least, important evidence of legislative intent.

So while an out-of-state bank in Georgia clearly can make a payday loan at a 500% APR, the State of Georgia, nonetheless, may regulate an out-of-state bank's procurement and collection practices in Georgia.  <u>See</u> 12 U.S.C. § 1820(h)(1)(A).

In the same vein, the language of § 27(a) does not mention in-state, non-bank agents or agents at all, or expressly permit out-of-state banks to use any in-state business or person it happens to select as an agent.  For example, Georgia has the right to require payday stores to be licensed and out-of-state banks could not use an in-state agent who is not licensed to do business in Georgia.  There is no language in § 27(a) addressing which local, <u>non-bank</u> vendors may properly act as agents in loan transactions or under what circumstances local, non-bank vendors may so act.  Nothing in § 27(a) seeks to regulate the entirely separate agency

contracts entered into between out-of-state banks and payday stores. Instead, the scope of § 27(a) is quite narrow and restricted to one element of any loan by out-of-state banks: the interest rate.[23]

### 4.    The Georgia Act

The next question is whether the Georgia Act falls within the above preemptive scope of § 27(a). The Act contains a severability provision, and thus we proceed section-by-section through the Act.[24]

Obviously, § 27(a) expressly preempts certain state legislation. For example, if Georgia had enacted legislation that said "out-of-state banks cannot charge interest rates on any loan greater than Georgia's 16% cap," we would have no difficulty determining that such state legislation was expressly preempted by § 27(a).

On the other hand, as discussed above, Georgia can regulate a variety of

---

[23]The dissent states that "[p]reemption would be a meaningless doctrine if states could effectively rewrite federal statutes by adding conditions or limitations." In this case, the Georgia Act does not add a condition or limitation to a federal statute. Instead, as explained herein, the Georgia Act regulates conduct <u>outside</u> the scope of § 27(a). Rather than making preemption the all-powerful force the dissent suggests, we limit federal preemption of the state's regulation of state banks to what it is intended – preemptive only within the scope of § 27(a).

[24]The severability provision provides: "If any provision of this chapter or the application of such provision is found by a court of competent jurisdiction in the United States to be invalid or is found to be superseded by federal law, then the remaining provisions of this chapter shall not be affected, and this chapter shall continue to apply to any other person or circumstance." Ga. Code Ann. § 16-17-10.

collateral activities associated with loans. If Georgia had enacted legislation that precluded felons convicted of fraud from being licensed fiscal agents in loan transactions in Georgia or precluded banks (including out-of-state banks) from employing such felons in Georgia as third-party vendors or service providers to handle loan funds, we would have no difficulty determining that such state legislation was not preempted by § 27(a). None of the parties dispute Georgia's ability to regulate agency arrangements between in-state felons and out-of-state banks. Likewise, no one disputes Georgia's ability to regulate in-state businesses, such as the local payday stores in this case.

Therefore, the first question is whether the Act, and in particular § 16-17-2(b)(4), is a prohibited interest-rate limitation on loans between Bankwest and its borrowers or a permitted agency regulation on when non-bank payday stores operating in Georgia may properly serve as agents for out-of-state banks.[25]

---

[25]In expanding the plain language of § 27(a), the dissent uses these two theories: that restricting an in-state agent is a way "of getting at the principal" and that Georgia may not indirectly restrict the authority that § 27(a) gives out-of-state banks by directly restricting the actions of in-state agents. In our view, these theories implicitly recognize that the Georgia Act does not directly encroach upon the authority granted by § 27(a). They also support our conclusion that the plain language of § 27(a) does not reach the conduct regulated by the Georgia Act. Indeed, the language of § 27(a) says nothing about the loan procurement or collection practices by agents and nothing about agents, much less in-state, non-bank agents of out-of-state banks. Instead, § 27(a) directly restricts only interest-rate limitations and cannot be so expanded to cause indirect preemption of the agency agreement between in-state entities, such as payday stores, and out-of-state banks.

### 5. Section 16-17-2(b)(4) of the Georgia Act

For the following reasons, we conclude that § 16-17-2(b)(4) of the Act is a permitted agency limitation that applies to the agency agreement between in-state payday stores and out-of-state banks, and, thus, is not expressly preempted by § 27(a).

First, and most importantly, nothing in § 16-17-2(b)(4) purports to place any direct limitation on interest rates an out-of-state bank may charge individual borrowers on any loan in Georgia. Rather, out-of-state banks are permitted to charge the same home-state interest rates in Georgia as they were before the Act. As detailed above, the Georgia Act repeatedly exempts out-of-state banks from not only the definition of payday lenders and payday lending, but from various other provisions of the Act. In fact, § 16-17-2(b)(4) and even the Act itself does not place any limitation on the entirely separate loan contract between the out-of-state bank and the borrower.

Second, as discussed above, there are many means by which an out-of-state bank may issue payday loans to its customers in Georgia. In fact, out-of-state banks may continue to use agents and agency agreements, including independent, local payday stores in Georgia. All that is required for out-of-state banks and in-state payday stores to continue with the exact same business model is for the two

33

entities to alter the agency contract between them so as to provide that the payday store receives only 50% of the revenue from the payday loan. At most, the Act removes only one type of agency agreement that in-state payday stores can have with out-of-state banks. Therefore, the Act is nothing more than a narrow agency limitation on contracts between in-state payday stores and out-of-state banks.

Third, § 27(a) refers to "State banks" and certainly protects its subsidiaries, various employees, divisions, and the like. Section 27(a) does not address or purport to protect an out-of-state bank's ability to use any local, non-bank vendors as agents or to have any form of agency relationship with non-bank vendors. There is also nothing in § 27(a) that preempts a state's power to regulate local, non-bank entities operating within the state as independent contractors or agents for an out-of-state bank. Thus, in the absence of some "clear and manifest" expression of Congressional purpose that States may not regulate non-bank payday stores' agency relationships which effectively enable the non-bank stores to do what Congress permits out-of-state banks to do, the Georgia statute is not preempted.

The plaintiffs in this case are essentially asking us to rewrite § 27(a) to read as follows.

In order to prevent discrimination against State-chartered insured

34

depository institutions, . . . such State bank . . . may, notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section, . . . charge on any loan . . . interest . . . at the rate allowed by the laws of the State . . . where the bank is located <u>and such State bank may procure these loans using any separate, local, and non-bank business as an agent and under any agency terms it selects</u>.

We decline to do so. Rather, we decide the express-preemption issue on the basis of the plain language of the statute as it is written.

For all the above reasons, we conclude that § 27(a) does not expressly preempt § 16-17-2(b)(4) of the Georgia Act, which precludes in-state payday stores from acting as agents for out-of-state banks when the payday store retains the predominate economic interest in the payday loan.

**6.      Section 16-17-2(d) of the Georgia Act**

While the Act exempts out-of-state banks from direct liability in § 16-17-2(d), we also must discuss the remainder of § 16-17-2(d) because the parties dispute whether it could be used to prosecute an out-of-state bank as an "aider and abettor" <u>of the in-state payday store's violation of the Act</u>. The district court determined that the Act does not apply to out-of-state banks that "aid or abet" in-state agents by entering into prohibited agency contracts with them. <u>See Bankwest, Inc. v. Baker</u>, 324 F. Supp.2d 1333, 1346 n.7 (N.D. Ga. 2004). Section 16-17-2(d) contains the only aid-and-abet provision in the Act and provides:

35

Any person who violates subsection (a) or (b) of this Code section shall be guilty of a misdemeanor of a high and aggravated nature and upon conviction thereof shall be punished by imprisonment for not more than one year or by a fine not to exceed $5,000.00 or both. Each loan transaction shall be deemed a separate violation of this Code section. Any person who aids or abets such a violation, including any arbiter or arbitration company, shall likewise be guilty of a misdemeanor of a high and aggravated nature and shall be punished as set forth in this subsection. If a person has been convicted of violations of subsection (a) or (b) of this Code section on three prior occasions, then all subsequent convictions shall be considered felonies punishable by a fine of $10,000.00 or five years imprisonment or both.

Ga. Code. Ann. § 16-17-2(d) (emphasis added).

The parties do not dispute that penalties for any direct violation of the Act do not apply to out-of-state banks. Subsection (d) of § 16-17-2 begins with the language that "[a]ny person who violates subsection (a) or (b) . . . shall be guilty of a misdemeanor . . . ." Id. § 16-17-2(d). Because out-of-state banks are exempt from liability under subsections (a) and (b), an out-of-state bank is not "any person" who can violate subsection (a) or (b). See id. §§ 16-17-2(a)(3), (b).

However, in addition to the penalties for a violation of subsections (a) or (b), the third sentence in subsection (d) goes on to state that "[a]ny person who aids or abets such [a direct] violation" is also guilty of a misdemeanor. Id. § 16-17-2(d).

Although the Act grants an exception for liability to out-of-state banks in

36

subsections (a) and (b), and in the first and last sentences of subsection (d), it does not grant a similar exception in the aid-and-abet sentence in subsection (d).  One argument is that because the Act throughout either exempts, or otherwise has no application to, out-of-state banks, this Court should conclude that the Georgia legislature also intended to exempt out-of-state banks from liability as an aider-and-abettor of the payday stores' violations of the Act.[26]  However, when a legislative body "'includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that [the legislative body] acts intentionally and purposely in the disparate inclusion or exclusion.'" KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 125 S. Ct. 542, 548 (2004) (quoting Russello v. United States, 464 U.S. 16, 23, 104 S. Ct. 296, 300 (1983)).

We do note that the State of Georgia avows here that it has no intention of

---

[26]The fuller argument is that it is logical to read the "any person" language in subsection (d) in a consistent manner; that is, because an out-of-state bank is not "any person" for the purposes of the first or last sentence in subsection (d), an out-of-state bank should not be considered "any person" in the third sentence of subsection (d).  It arguably makes little sense to grant an exemption for direct liability to out-of-state banks in § 16-17-2(a)(3), again in § 16-17-2(b), and even in the first and last sentences of § 16-17-2(d), only to take it away as an aider or abettor in subsection (d) because that one sentence did not repeat the exception.  More importantly, the Georgia Act at the outset, in § 16-17-1(a), defines payday lenders and payday lending for the purposes of the Act and exempts out-of-state banks from both definitions.  The § 16-17-1(a) exemption for out-of-state banks applies to all payday lending covered by the Act. Given the blanket exceptions in both §§ 16-17-1(a) and 16-17-2(a)(3), and the statutory framework of § 16-17-2(d), the argument is that out-of-state banks may not be prosecuted under even the aid-and-abet sentence in § 16-17-2(d).

37

prosecuting out-of-state banks as aiders and abettors.  We ultimately need not decide this question of Georgia law because even if the aid-and-abet provision in subsection (d), as written, permits the State of Georgia to prosecute out-of-state banks as aiders and abettors, we conclude that subsection (d) is not preempted.

Because Georgia has the power to keep in-state payday stores from acting as agents for out-of-state banks in the limited circumstances where the stores retain the predominate economic interest in the payday loan, we conclude that the State of Georgia is not prohibited from reasonably punishing not only such violators but also those who aid and abet such violations.  Section 27(a) does not preempt state legislation imposing penalties on: (1) payday stores who enter into illegal agency agreements; and (2) out-of-state banks who aid and abet such violations.  This is precisely what § 16-17-2(d) does, and, therefore, it is not preempted.

### 7.    Section 16-17-3 of the Georgia Act

Having concluded that § 16-17-2(b)(4)'s prohibition of one type of agency agreement and § 16-17-2(d)'s penalty for violating the agency-agreement prohibition are not preempted by § 27(a), we next must consider whether § 16-17-3 of the Georgia Act is preempted.  Section 16-17-3 provides three things: (1) any person who violates §§ 16-17-2(a) or (b) shall be barred from collecting the indebtedness created by said loan transaction; (2) said loan transaction is void ab

38

initio; and (3) any person who violates §§ 16-17-2(a) or (b) shall be liable for civil damages. Specifically, § 16-17-3 states, in relevant part:

> Any person who violates subsection (a) or (b) of Code Section 16-17-2 shall be barred from the collection of any indebtedness created by said loan transaction and said transaction shall be void ab initio, and any person violating the provisions of subsection (a) or (b) of Code Section 16-17-2 shall in addition be liable to the borrower in each unlawful transaction for three times the amount of any interest or other charges to the borrower.

Ga. Code Ann. § 16-17-3. Because out-of-state banks are exempt under §§ 16-17-2(a) and (b) and, thus, cannot violate subsection (a) or (b), it is clear that the civil-damage penalty and the collection-of-indebtedness bar in § 16-17-3 do not apply to out-of-state banks.

The remaining part of § 16-17-3 does impact out-of-state banks. If an in-state payday store procured a payday loan in the bank's name through a prohibited agency agreement with the out-of-state bank, § 16-17-3 does make that payday loan void in that limited circumstance. Therefore, we must consider whether § 16-17-3 is preempted by § 27(a).

It is important to understand that the Georgia Act does not void the payday loan because of the interest rate on the loan. If the payday store procures a high-interest-rate loan for the out-of-state bank and does not retain over 50% of the revenue, § 16-17-3 has no application to the out-of-state bank's high-interest-rate

loan. Rather, Georgia has instituted this penalty – voiding the loan – only for loans procured by payday stores for out-of-state banks under a prohibited agency agreements. Georgia voids the loan due to the payday store's violation of Georgia's law, § 16-17-2(b)(4), prohibiting certain agency agreements in the procurement of payday loans.

Section 27(a) does not serve as an all-powerful shield that protects an out-of-state bank's loan no matter what procurement or collection conduct the bank's agent engages in. As detailed above, even the FDIA reserves an important and primary role for the states in the regulation of state banks, and the host state's fraud and consumer protection laws still apply to out-of-state banks operating in the host state. If the payday stores' loan-procurement practices violate the host state's consumer protection laws, then Georgia has the power to void the loan procured by the payday store in an illegal manner.

In the end, we see no reason to preclude Georgia from punishing violations of its agency rule in the manner it has selected because the violation depends upon the existence of a prohibited agency agreement and does not occur if the payday store does not have the predominate economic interest in the payday loan. Consequently, we conclude that the portion of § 16-17-3 that voids an out-of-state bank's loan procured by an in-state agent under a prohibited agency agreement is

not preempted.[27]

## F.    The Commerce Clause

The out-of-state banks and payday stores also assert that the Georgia Act

violates the dormant aspect of the Commerce Clause.  Although the plaintiffs raise

this issue, they devote very little attention to the issue in their briefs.  Likewise, we

quickly resolve this issue.

The Commerce Clause states that "Congress shall have Power . . . [t]o

regulate Commerce . . . among the several States . . . ."  U.S. CONST. art. I, § 8, cl.

3.  Although the Commerce Clause directly limits the power of Congress, it is well

established that the Commerce Clause has a "dormant" or "negative" aspect as

well; that is, that the Commerce Clause serves as "a substantive restriction on

permissible state regulation of interstate commerce."  Dennis v. Higgins, 498 U.S.

439, 447, 111 S. Ct. 865, 870 (1991) (internal quotation marks omitted).  "This

'negative' aspect of the Commerce Clause prohibits economic protectionism – that

is, regulatory measures designed to benefit in-state economic interests by

---

[27]As of this point, out-of-state banks are well aware of the rules for selecting agents in Georgia – you may select any independent, non-bank agent you wish as long as you do not allow the agent to hold the predominate economic interest in the loan.  Indeed, upon the enactment of this agency rule, the out-of-state banks and payday stores promptly filed this lawsuit.  Should an out-of-state bank now elect to procure its payday loans through prohibited agency agreements and violate this simple, straight-forward agency rule, then the payday loans procured in this prohibited manner are void.

burdening out-of-state competitors." New Energy Co. of Ind. v. Limbach, 486 U.S. 269, 273-74, 108 S. Ct. 1803, 1807 (1988). The Commerce Clause also serves to prevent states from "ventur[ing] excessively into the regulation of . . . [interstate] commerce . . . [and] trespass[ing] upon national interests . . . ." Kassel v. Consol. Freightways Corp. of Del., 450 U.S. 662, 669, 101 S. Ct. 1309, 1315 (1981) (internal quotation marks omitted).

To determine whether a statutory scheme violates the dormant or negative aspect of the Commerce Clause, courts employ two tiers of analysis. Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth., 476 U.S. 573, 578-79, 106 S. Ct. 2080, 2084 (1986). If the state scheme "directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry." Id. at 579, 106 S. Ct. at 2084. But, if the discriminatory state regulation in question "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives," the state regulation will be upheld. Limbach, 486 U.S. at 278, 108 S. Ct. at 1810; see also Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 353, 97 S. Ct. 2434, 2446 (1977). In all other instances, courts have determined that the discriminatory state regulation violated the dormant or negative aspect of the Commerce Clause.

42

However, if a state regulation only indirectly affects interstate commerce and regulates both in-state and out-of-state interests equally, courts "have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." Brown-Forman, 476 U.S. at 579, 106 S. Ct. at 2084. Though the two tiers of analysis are not clearly distinguishable, "[i]n either situation the critical consideration is the overall effect of the statute on both local and interstate activity." Id.

The plaintiffs' argument that the Georgia Act violates the dormant or negative aspect of the Commerce Clause is without merit. It is undisputed that the Act makes no attempt to regulate the interest rate out-of-state banks can charge borrowers in Georgia. In-state banks, however, are limited to Georgia's 16% cap. Furthermore, out-of-state banks are still permitted to use in-state payday stores as agents as long as they do not give the payday store the predominate economic interest in the payday loan. In-state banks may not use payday stores to charge more than Georgia's 16% cap no matter what the in-state banks pay the payday stores. Therefore, the Act actually places fewer restrictions on out-of-state banks than it does on Georgia-based banks. Consequently, there is no violation of the dormant or negative aspect of the Commerce Clause.

## G.    The Arbitration Provision

43

Section 16-17-2(c)(2) of the Georgia Act declares arbitration clauses in payday loan contracts void if the payday loan contract is "unconscionable." See Ga. Code Ann. § 16-17-2(c)(2). The out-of-state banks and payday stores contend that the provisions of the Georgia Act dealing with arbitration are preempted by the Federal Arbitration Act. The plaintiffs, however, lack standing to challenge the arbitration provisions in the Act.[28]

For a plaintiff to have standing to sue in federal court, he must allege in his complaint, or otherwise through the course of the proceedings, "that he has suffered an injury in fact"; in other words, "some harm to a legal interest that is actual or imminent, not conjectural or hypothetical." Bowen v. First Family Fin. Servs., Inc., 233 F.3d 1331, 1339 (11th Cir. 2000) (internal quotation marks and citation omitted). In the context of a plaintiff's challenge to the enforceability of

_____

[28]In Jenkins v. First Am. Cash Adv. of Ga., 400 F.3d 868 (11th Cir. 2005), this Court addressed a situation in which a borrower in Georgia brought a class action against two national banks, raising state law claims challenging payday loan agreements. The Jenkins Court addressed a situation in which the borrower and the national bank has signed an Arbitration Agreement stipulation that all disagreements were governed by the Federal Arbitration Act. This Court determined that the arbitration agreements in payday loans by national banks were not unconscionable, and, thus, were enforceable. Id. at 881.

In Jenkins, the appellant also argued that the "underlying payday loan contracts are illegal and void ab initio under Georgia law." Id. This Court concluded that because the Arbitration Agreements were valid, the underlying legality of the payday lending transactions was "an issue for an arbitrator, not the court, to decide." Id. at 882.

Because we conclude that the plaintiffs do not have standing to challenge the arbitration provisions in the Georgia Act, we need not determine what import Jenkins has on those provisions.

an arbitration clause in a loan agreement, we have held that the plaintiff must allege that an arbitration between the lender and the borrower is imminent or "certainly impending." Id. at 1340 (quoting Whitmore v. Arkansas, 495 U.S. 149, 158, 110 S. Ct. 1717, 1724-25 (1990)). There simply being "a 'perhaps' or 'maybe' chance that the arbitration agreement will be enforced . . . is not enough to give [the plaintiffs] standing to challenge its enforceability." Id. It follows that in order to challenge the validity of a statute that tends to undermine the enforceability of an arbitration agreement, a party must show harm to its interest in enforcing the agreement that is actual or imminent. The party seeking an injunction against enforcement of the statute must show that arbitration, which is a prerequisite to application of the statute, is imminent or certainly impending. It is not enough that there may be arbitration and that the statute may be applied if there is.

The plaintiffs have not met their burden in this regard. They have not even alleged in their complaint or in their motion for a preliminary injunction that any breaches of the loan agreements have occurred or are imminent. They have not alleged that if there are breaches there will be arbitration. The agreement gives either party the right to elect arbitration but does not require disputes to be

arbitrated if neither party elects it.[29]

Maybe there will be breaches, and maybe in connection with those breaches someone will elect arbitration, and maybe if that happens the Georgia statutory provision in question will be asserted and applied. But maybe is not enough. See id. Having failed to demonstrate imminent or certainly impending injury from Ga. Code Ann. § 16-17-2(c)(2), the out-of-state banks and payday stores lack standing to challenge this provision. It necessarily follows that the district court did not abuse its discretion in denying them a preliminary injunction against enforcement of the provision.

The Act contains another provision that refers to arbitration. Specifically, the aiding or abetting provision of § 16-17-2(d) mandates that "any arbiter or arbitration company" that aids or abets a violation of the Act will be subject to sanctions under the Act. The out-of-state banks and payday stores argue that § 16-17-2(d) is preempted by the FAA because it is "repugnant" to the FAA.

It is not clear from the Georgia Act what action by an arbitrator would amount to aiding or abetting a violation of the Act, nor is it apparent why the Georgia General Assembly saw fit to specially include arbitrators in the aiding or

---

[29] We are referring specifically to the arbitration portion of the loan agreement between Bankwest, Advance America, and the borrower. As we stated before, we have been led to believe that this agreement is typical.

abetting provision. Although we question the validity of a regulation that would subject an arbitrator to liability merely for deciding a payday loan dispute in accordance with the arbitration clause in a payday loan contract, we need not decide that issue, because neither the out-of-state banks nor the payday stores are arbitrators.

The plaintiffs in this case will never be prosecuted or sued as arbitrators for acting in contravention of the Act. Therefore, the out-of-state banks and payday stores have asserted no injury-in-fact particular to them, see Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 103, 118 S. Ct. 1003, 1016 (1998), nor have they alleged facts sufficient to stand in the place of the arbitrators. See Powers v. Ohio, 499 U.S. 400, 410-11, 111 S. Ct. 1364, 1370-71 (1991) (holding that in order for a litigant to bring an action on behalf of a third party, the litigant must demonstrate that (1) he has "suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute"; (2) he has "a close relation to the third party"; and (3) there is "some hindrance to the third party's ability to protect his or her own interests" (internal citations omitted)). In short, the out-of-state banks and payday stores lack standing to challenge the arbitration provisions.

## V. CONCLUSION

47

For all the above reasons, we conclude the district court did not abuse its discretion in denying a preliminary injunction.

AFFIRMED.

CARNES, Circuit Judge, dissenting:

Congress enacted a statute providing that any state-chartered bank may "charge on any loan . . . interest . . . at the rate allowed by the laws of the State . . . where the bank is located." 12 U.S.C. § 1831d(a). Everyone agrees Congress intended to ensure that the maximum interest rate a bank like BankWest, which is chartered in South Dakota, can charge on loans made in another state is the higher rate permitted under South Dakota law, not the lower rate that the other state prefers. To prevent states from interfering with the right to charge higher interest rates that it created, Congress explicitly provided that the right exists "notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section." Id. Congress probably thought that using broad language to create the federal right and inserting a clear and unequivocal preemption clause to protect that right from state interference would be enough. If so, it underestimated the State of Georgia's determination to evade federal law and the willingness of this Court to permit states to do so.

The majority opinion attempts to paint this case as one in which a bunch of cunning cash advance stores have purchased the authority of out-of-state banks as part of their scheme to get around Georgia's usury laws. In this picture, BankWest and other out-of-state banks are not real players but instead only passive pawns

49

that lease their charters to the cash advance stores; those stores are actually the lenders, perform all the critical functions, carry most of the risk, and to use the majority's phrase "effectively do all the work." Ante, at 6. That's not a pretty picture, but neither is it one the record in this case supports.

The record shows that it is the banks, and not the cash advance stores, that perform the critical loan functions. The parties agree that BankWest and Advance America are exemplars of the out-of-state banks and their in-state agents, and the record contains the contractual agreement between them. Under that agreement, it is BankWest that provides all of the funds that are loaned. Advance America provides none. It is BankWest that determines which borrowers will receive a loan because, as an undisputed affidavit establishes, BankWest "in its sole discretion, determines all underwriting criteria that must be satisfied by a prospective borrower." Advance America has no control over the underwriting criteria that BankWest applies to these loans.[1]

---

[1] The majority opinion says that Bankwest uses "Tele-Track," a third-party loan-processing agent to approve or disapprove loans, and that Advance America also uses Tele-Track in states where Advance America makes loans in its own name. Ante, at 8 & n.5. We are not told the significance of that fact. It may be that Bankwest and Advance America also use the same brand of copy machine or the same long-distance carrier, but so what?

The majority may be hoping that some readers will infer from the fact that Tele-Track is commonly hired to apply a lender's loan criteria that Bankwest and Advance America use the same loan criteria. The record provides no support at all for that inference; it is silent about what underwriting criteria Advance America uses when making loans itself instead of acting as an

The affidavits show that "BankWest also establishes, in its sole discretion, the terms and features of the loans, including the loan amounts, fees and charges, interest rate, repayment terms, credit limits and credit standards." By contrast, "Advance America has no control or authority over the loan approval process, underwriting criteria, credit terms, credit standards or the terms and conditions of the loans between BankWest and its Georgia borrowers." Not only that, but Advance America is not even a party to the loan agreement. Instead, "[t]he Loan Agreement is a promissory note between the borrower and BankWest, which, among other things, clearly states that BankWest is the lender on the loan, and obligates the borrower to repay the loan with interest to BankWest on or before the stated maturity date." Nor does Advance America have a legal right to the loan receivables. Instead, "[t]he loan receivables are BankWest's assets, and BankWest records them as such on the bank's financial statements."[2]

agent for a lender. The record, however, does show something on that subject about three other cash advance stores that serve as Georgia agents for out-of-state banks. It shows that when those stores are located in states that allow them to make this type of loan directly to consumers, they use different underwriting criteria than the out-of-state banks use in Georgia.

[2] In what is more a questionable implication than a misrepresentation, the majority opinion says that: "Accordingly, the local payday stores in this case have entered into arrangements with out-of-state banks to serve as their agents in Georgia." Ante, at 5. That sounds as though the payday stores sought out the banks. There is nothing in the record to show who sought out whom. It would be just as accurate to say that the banks entered into arrangements with those stores to serve as the banks' agents in Georgia. In fact, an affidavit in the record does put it that way: "BankWest contracted with Advance America to act as BankWest's authorized fiscal agent in Georgia . . . ."

51

Advance America bears no risk of loss of principal, because it advances none of the principal. BankWest advances all of the principal and bears all of the risk that principal will be lost. The only risk of loss that Advance America has is for part of the loan revenues (the finance charges).

The way the contractual loss assignments have played out in the real world of cash advance loans in Georgia is that Bankwest has borne twice as much of the loan loss as Advance America. The record contains this sworn statement about the actual loss data for the fourteen-month period just before the filing of the motion for injunction: "For the period of January 2003 through February 2004, the Loss Rate Standard on the aggregate portfolio of loans made by BankWest to Georgia borrowers was approximately 12.5%. Thus, BankWest was responsible for approximately 68% of all loan losses incurred during that period."[3] So, Advance America suffered less than one-third of the losses, BankWest more than two-thirds.

The facts, then, are that BankWest is the true lender. It is not only identified as such in the loan documents, but it also performs all of the critical loan decision-

_____

[3] Maybe a little more explanation will help. BankWest was responsible for loan losses up to the first 8.5 percent of the finance charges. Because the loan loss was 12.5 percent of the finance charges, and BankWest was responsible for the loan loss on the first 8.5 percent of the finance charges, it shouldered 68 percent of the loan loss for that fourteen-month period. (8.5% ÷ 12.5% = 68%).

making functions, supplies all of the funds for the loan, is the only one exposed to any loss of principal, and has borne most of the loan losses that have actually occurred.

The factual spinning and loaded language of the majority opinion aside, the real defect in that opinion is its express preemption analysis. The Supreme Court has instructed us that: "In deciding whether a federal law pre-empts a state statute, our task is to ascertain Congress' intent in enacting the federal statute at issue. Pre-emption . . . is compelled [when] Congress' command is explicitly stated in the statute's language . . . ." Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 95, 103 S. Ct. 2890, 2899 (1983) (internal quotations omitted).[4] Here, Congress' preemptive command is explicitly stated in the statutory language. Yet the majority decision

_____

[4] There is, to be sure, an "assumption that the historic police powers of the states are not superceded by federal law unless preemption is the clear and manifest purpose of Congress," Cliff v. Payco Gen. Am. Credit, Inc., 363 F.3d 1113, 1122 (11th Cir. 2004), but just as surely, that "'assumption' of non-preemption is not triggered when the State regulates in an area where there has been a history of significant federal presence," United States v. Locke, 529 U.S. 89, 108, 120 S. Ct. 1135, 1147 (2000). Usury laws are an exercise of the historic police powers of the states, but there has been a history of significant federal presence in banking, particularly interest rates on a national scale. Indeed, a heavy federal presence in the field and extensive federal regulation of national interest rates extends back at least as far as the 1884 amendments to the National Bank Act of 1864. See Barnett Bank of Marion County, N.A. v. Nelson, 517 U.S. 25, 32–34, 116 S. Ct. 1103, 1108–09 (1996); see also Franklin Nat'l Bank of Franklin Square v. New York, 347 U.S. 373, 375–76, 74 S. Ct. 550, 552–53 (1954). Section 27(a) of the FDIA is part of that federal scheme, and, in fact, mirrors § 85 of the NBA. Compare 12 U.S.C. § 1831d(a), with 12 U.S.C. § 85. Because the Georgia Act attempts to interfere with the federal right of out-of-state banks to apply their charter-state interest rates nationally, it is not entitled to the benefit of a presumption against preemption.

does not obey that clear, compelling command.

The relevant portion of FDIA § 27(a) plainly says that "State-chartered insured depository institutions . . . may, <u>notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section</u>, . . . charge on <u>any loan</u> . . . interest . . . at the rate allowed by the laws of the State . . . where the bank is located."[5]  12 U.S.C. § 1831d(a) (emphasis added).  The question is not whether Congress intended to preempt state laws inconsistent with the right it created on behalf of out-of-state banks.  The preemptive command could not be clearer.  To the extent that "any State constitution or statute" attempts to define, condition, impinge upon, regulate, restrict, or otherwise affect the right of an out-of-state bank to charge an interest rate permitted under the laws of its charter state,

---

[5] Section 27(a) states in full:

> In order to prevent discrimination against State-chartered insured depository institutions, including insured savings banks, or insured branches of foreign banks with respect to interest rates, if the applicable rate prescribed in this subsection exceeds the rate such State bank or insured branch of a foreign bank would be permitted to charge in the absence of this subsection, such State bank or such insured branch of a foreign bank may, notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section, take, receive, reserve, and charge on any loan or discount made, or upon any note, bill of exchange, or other evidence of debt, interest at a rate of not more than 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where such State bank or such insured branch of a foreign bank is located or at the rate allowed by the laws of the State, territory, or district where the bank is located, whichever may be greater.

12 U.S.C. § 1831d(a).

that state law is preempted.

Because the scope of the preemption is coextensive with the federal right created, the question is the scope of the federal right. The key statutory word defining the scope of the federal right, the word upon which this issue turns, is "any." Section 27(a) says that state-chartered insured depository institutions may charge "on any loan" interest at the rate allowed by the laws of their charter state. 18 U.S.C. § 1831d(a) (emphasis added). "Any" is a powerful word.

Both the Supreme Court and this Court have made clear that "any" does not mean "some" or "all but a few," it means "all." For example, in United States v. Gonzales, 520 U.S. 1, 117 S. Ct. 1032 (1997), the question was whether the statutory phrase "'any other term of imprisonment' means what it says or whether it should be limited to some subset of prison sentences." Id. at 5, 117 S. Ct. at 1035 (internal quotation omitted). Because of the natural, expansive meaning of the word "any," and the absence of any limiting language in the statute, the Court concluded that "any term of imprisonment" meant all terms of imprisonment, without exception. Id.

Other decisions of the Supreme Court and this Court emphasize and re-emphasize that "any" does not mean some, or most; it means all. See, e.g., United States v. Alvarez-Sanchez, 511 U.S. 350, 358, 114 S. Ct. 1599, 1604 (1994)

(noting that a statute referring to "any law enforcement officer" includes "federal, state, or local" officers); CBS Inc. v. PrimeTime 24 Joint Venture, 245 F.3d 1217, 1223 (11th Cir. 2001) (holding that "'any termination' in the Improvement Act's § 1005(a)(2)(B)(iii) grandfather clause means all terminations of any kind"); Coronado v. Bank Atl. Bancorp, Inc., 222 F.3d 1315, 1321–22 (11th Cir. 2000) (holding that immunity under 31 U.S.C. § 5318(g)(3) for "any person under any law or regulation of the United States or any constitution, law, or regulation of any State" refers to all persons and all laws); Merritt v. Dillard Paper Co., 120 F.3d 1181, 1185–86 (11th Cir. 1997) (deciding that "participat[ion] in any manner" as used in anti-retaliation provision means "all" kinds of participation, even involuntary trial testimony).

In this case, we should interpret the statutory phrase "any loan" to mean all loans without exception, just as the Supreme Court in Gonzales interpreted the statutory phrase "any other term of imprisonment" to mean all other terms of imprisonment without exception, 520 U.S. at 5, 117 S. Ct. at 1035; just as the Supreme Court in Alvarez-Sanchez interpreted "any law enforcement officer" to mean all law enforcement officers without exception, 511 U.S. at 358, 114 S. Ct. at 1604; and just as we in Merritt interpreted "any termination" to mean all

terminations of any kind without exception, 120 F.3d at 1185–86.[6]

Because loans that out-of-state banks make through in-state agents are within the broad scope of the term "any loan," § 27(a) preempts state laws that attempt to regulate or restrict the interest rates that may be charged on those loans. In other words, § 27(a) preempts what the State of Georgia has done. It is as though the Georgia General Assembly rewrote the key language of that federal statutory provision by adding a sentence, so that it reads:

> State-chartered insured depository institutions . . . may . . . charge on any loan . . . interest . . . at the rate allowed by the laws of the State . . . where the bank is located. <u>But they may not do so through agents unless the bank receives the majority of the proceeds generated by the loan</u>.

Preemption would be a meaningless doctrine if states could effectively rewrite federal statutes by adding conditions or limitations. In this instance, the rewrite would change the established, all-encompassing meaning of "any" as it is used in § 27(a). Language that limits the meaning of congressionally chosen terms must

---

[6] The Supreme Court's recent decision in <u>Small v. United States</u>, 544 U.S. ___, 125 S. Ct. 1752 (2005), does not dictate a different interpretation here. In that case, the Court dealt with 18 U.S.C. § 922(g)(1)'s prohibition on the possession of firearms by persons who had been "convicted in any court" of a felony. <u>Id.</u> at ___, 125 S. Ct. at 1754. The Court began with "the legal presumption that Congress ordinarily intends its statutes to have domestic, not extraterritorial, application." <u>Id.</u> at ___, 125 S. Ct. at 1755. Finding "no convincing indication to the contrary" of that presumption, the Court concluded that § 922(g)(1)'s reference to convictions entered in "any court" means convictions entered in a domestic court. <u>Id.</u> at ___, 125 S. Ct. at 1756. No such presumption applies here where all the parties and transactions involved in this case are domestic.

57

come from Congress, not from the states. Just as a state cannot say for purposes of § 27(a) what a "State-chartered insured depository institution" is, it cannot say when such an institution is the entity "charg[ing]" the interest on a loan, and it cannot say what "any loan" is. Those are federal statutory terms. The power to define or redefine federal statutory terms is the power to evade or eviscerate these terms; it is the power to preempt the preemptive force of federal statutes, and it is a power the states do not have.

With mimicry that would make a mockingbird blush, the majority opinion has lifted the analytical device from the preceding paragraph of this opinion and inserted different words in an attempt to show that Congress did not envision the particular evasion enacted by Georgia. See ante, at 34–35. The majority's point, I suppose, is that Congress did not say out-of-state banks could use in-state agents under the specific contractual terms that BankWest uses Advance America. Of course it didn't. It is impossible to anticipate all the ways in which business will be done, just as it is impossible to anticipate all the ways in which states will attempt to thwart the preemptive will expressed in a federal statute. That is why Congress chose to use the all-encompassing term "any" in § 27(a) instead of more limited terms such as "some," "many," or "most."

Faced with the broad language of § 27(a), the majority opts to deny the

undeniable. Even though the language the federal statute uses is broad, the statute's application is, the majority insists, "quite narrow." Ante, at 31. The majority lists all the activities of out-of-state banks that Congress did not specifically mention in § 27(a), which means under the "quite narrow" view that Georgia can regulate those activities into oblivion. The targetable activities that are left unprotected by the preemption clause of § 27(a), the majority insists, include "collateral activity associated with the loan, such as marketing, advertising, solicitation, or any aspect of the loan procurement process" and "collection practices," and the matter of "separate contracts between out-of-state banks and in-state vendors." Ante, at 29–30.

So anemic are the provisions of the federal act under the majority's "quite narrow" view that states can prohibit out-of-state banks from using in-state agents at all, because § 27(a) says "nothing about agents, much less in-state, non-bank agents of out-of-state banks," and because it "directly restricts only interest-rate limitations and cannot be so expanded to cause indirect preemption of the agency agreement between in-state entities, such as payday stores, and out-of-state banks." Ante, at 32 n.25. In other words, the majority's "quite narrow" view is that states may thwart the preemption clause of § 27(a) by regulating agency relationships or prohibiting preferred forms of them, and by going after the

59

"collateral activity associated with" making loans, activities that are essential for an out-of-state bank to function in another state. See ante, at 29–30 (emphasis omitted).

And that is what Georgia has done. The theory with which Georgia has cloaked its evasive purpose is that where the in-state agent has the predominant economic interest in a loan, which Georgia considers to be the right to more than fifty percent of the loan-generated revenues, the in-state agent is the actual lender, not the out-of-state bank. See Ga. Code Ann. § 16-17-2(b)(4) ("A purported agent shall be considered a de facto lender if the entire circumstances of the transaction show that the purported agent holds, acquires, or maintains a predominant economic interest in the revenues generated by the loan."); see also Ga. Code Ann. § 16-17-6. Georgia's purpose is to get at the agent as a way of getting at the principal. Controlling a corporation's agents controls the corporation, just as binding a man's arms and legs binds the man.

If Georgia may do as it pleases to the in-state agents of out-of-state banks, then Georgia may do as it pleases to the out-of-state banks. Recognizing that, the state takes the position that federal rights of corporations may be conditioned, truncated, or abrogated by state laws so long as those laws are brought to bear on the agents through which the corporations act. And the majority has written that

60

untenable position into the law of this circuit. Section 27(a) grants out-of-state banks the authority to make loans in Georgia at the interest rates they may charge in their charter states. The State of Georgia may no more prevent that authority from being exercised through in-state agents than it may prevent that authority from being exercised on even-numbered days.

Not content with gutting the preemption clause of the federal act, the majority also tries to soft-peddle the plain language of the Georgia Act to make it seem as though all the Act does is affect one little bitty aspect of the agency relationship between out-of-state banks and in-state agents. That is not the reality. The reality is that Georgia has acted to strip from out-of-state banks the right that § 27(a) gives them, if those banks structure their business in the way that they think best in light of business considerations and market forces. What Georgia has said is that the out-of-state banks Congress has specifically protected from state usury laws will not be protected by § 27(a) unless those banks quit doing business the way they prefer and start doing business the way the state prefers. And it just so happens that Georgia prefers that out-of-state banks covered by § 27(a) not do business in the way those banks have chosen to do it. What a coincidence.

Of course, Georgia does not actually care one whit about how the banks do business. All the state is concerned with is whether the banks exercise their

federal statutory right to charge § 27(a) interest rates. The banks and their in-state agents can structure their relationship any way they want and can divide up revenue according to the phases of the moon insofar as Georgia is concerned, IF only the banks will give up their federal right to charge higher interest rates than state law allows. Georgia has effectively put a price on the exercise of the federal statutory right, the price being that banks cannot structure their business relationships the way they have chosen. By slapping that price tag onto § 27(a), Georgia has conditioned the exercise of a federal right on compliance with the state's dictates, even though the federal statute granting the right explicitly preempts state laws on the subject. And the majority is letting Georgia get away with doing that.

The authority the State of Georgia claims in this regard would have no limit. If Georgia can decide that lending at charter-state interest rates is prohibited where the in-state agent has the predominant economic interest in the loan-generated revenue—that "any loan" in the federal statute does not mean all loans—it can decide that lending is prohibited where the in-state agent has an interest in one-fourth of the loan-generated proceeds, or in one-tenth of them, or where the in-state agent has any interest in them at all. Under the majority's "quite narrow" view of the preemptive force of § 27(a), Georgia could simply declare that, under

62

its own definition of the federal statutory terms, any in-state agent of an out-of-state bank is the de facto lender, not the bank. The majority embraces that position.[7]

None of this is to say that Georgia may not reasonably regulate in-state agents of out-of-state banks, so long as it does so on the same terms that it regulates agents of in-state banks. For example, if Georgia wants to forbid banks from using agents who have been convicted of felonies, nothing in § 27(a) would prevent it from doing so. But that prohibition would have to be interest-rate neutral, which is to say that Georgia's regulation of agents may not be keyed to a bank's exercise of its § 27(a) interest-rate authority. Georgia may not forbid an out-of-state bank charging § 27(a) protected rates from using any arrangement that it permits a bank not charging those rates to use. More specifically, Georgia may not forbid, restrict, or condition the use of agents generally, or particular categories of agents, as a way of preventing an out-of-state bank from using those agents to exercise its federal statutory right to charge higher interest rates.

Yet that is precisely what Georgia has done. Georgia does not generally

---

[7] The majority states: "Indeed, the language of § 27(a) says nothing about the loan procurement or collection practices by agents and nothing about agents, much less in-state, non-bank agents of out-of-state banks. Instead, § 27(a) directly restricts only interest-rate limitations and cannot be so expanded to cause indirect preemption of the agency agreement between in-state entities, such as payday stores, and out-of-state banks." Ante, at 32 n.25 (emphasis in original).

63

forbid the use of agents by banks when the agents have a "predominant economic interest" in loan-generated revenue. It permits banks to use agents regardless of how the economic interests are divvied up by them, so long as they do not charge the higher interest rates that § 27(a) permits. If BankWest were not attempting to exercise the higher interest rate authority Congress has given it, Georgia's law would not apply regardless of whether Advance America received half, three-fourths, nine-tenths, or all of the loan-generated revenues. Georgia does not care how much of the revenue an agent receives so long as the agent is not used in the exercise of an out-of-state bank's federally protected right to charge higher interest rates than state law allows. Only because BankWest's arrangement with Advance America serves to further its federally granted § 27(a) authority does Georgia want to "regulate" that relationship. It wants to "regulate" principal-agent relationships used to effectuate § 27(a) rights in the same way that the American Temperance League wanted to "regulate" alcohol.

Don't get me wrong. The fact that § 27(a) preempts the Georgia Act's attempt to restrict an out-of-state bank's ability to export interest rates does not mean that any transaction where an out-of-state bank associates with a non-bank agent in Georgia is protected, even if the relationship is clearly a sham. If, under federal law, a transaction is not actually a loan from an out-of-state bank within

64

the meaning of § 27(a), then the bank does not have the right to export its charter state's interest rate under § 27(a). That is, however, an issue that must be answered under federal law, not under state law. Georgia has not argued that the loans involved in this case are shams under federal law, but instead has attempted to use state law to redefine federal statutory terms, which is something it may not do.

I recognize the serious policy concerns that motivated the Georgia General Assembly to enact this legislation, and if I were in Congress I might well support an amendment of § 27(a) on those grounds. But I am not in Congress. Neither are my two colleagues who are in the majority in this case. Our duty is to interpret the laws that Congress has enacted, not to shape them to our policy views through a "quite narrow" interpretation. Any complaints about the policy effects of § 27(a) are, to borrow a phrase from the Supreme Court in another banking case, "better addressed to the wisdom of Congress than to the judgment of this Court." Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp., 439 U.S. 299, 319, 99 S. Ct. 540, 550–51 (1978).

Because § 27(a) expressly preempts the Georgia Act with regard to its regulation of interest rates charged by out-of-state banks, I would hold that the out-of-state banks and their in-state agents have met their burden of demonstrating

65

the first prong of the preliminary injunction determination, which is a substantial likelihood of success on the merits. As for the second prong, the district court found, and the State of Georgia does not dispute, that the banks and their agents have sufficiently demonstrated irreparable harm.

In analyzing the third prong, the district court found that the threatened injury to the out-of-state banks and their in-state agents did not outweigh the damage the injunction would cause to the citizens of the State of Georgia, and as a result that they had not met their burden on this prong. In the three sentences devoted to this topic, the district court summarily found that "[a]n injunction against enforcement of the Act would permit payday lenders to continue collecting exorbitant amounts of interest from thousands of Georgia citizens who can ill afford it." Bankwest, Inc. v. Baker, 324 F. Supp. 2d 1333, 1357 (N.D. Ga. 2004). That finding is defensible only if one assumes, as the district court had concluded, that the Georgia Act is not expressly preempted by § 27(a). But it is preempted, and that changes things. In the words of the Fifth Circuit, "[s]ince Congress expressly preempted this area of regulation, the states are not injured by the injunction" and "there is no injury to the states to weigh." See Trans World Airlines, Inc. v. Mattox, 897 F.2d 773, 784 (5th Cir. 1990), holding recognized as limited on other grounds by Johnson v. Baylor Univ., 214 F.3d 630 (5th Cir.

66

2000).

The same analysis holds true with regard to the fourth prong of the preliminary injunction analysis. Issuing an injunction to ensure the proper operation of federal law is not adverse to the public interest. <u>See</u> <u>id.</u> The public interest is best served by applying federal law as directed by the express language of § 27(a).

Because the out-of-state banks and their in-state agents have met their burden on each of the four prongs of the preliminary injunction analysis, the district court abused its discretion in failing to grant them a preliminary injunction. Accordingly, I dissent.